**JACK ECKERD CORPORATION, Plaintiff,**

v.

**DART GROUP CORPORATION, Defendant.**

**Civ. A. No. 85–341 LON.**

United States District Court, D. Delaware.

July 3, 1985.

Richard L. Sutton (argued), and Jack B. Blumenfeld, of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., for plaintiff; Sheldon Raab, and Stephen Lew, of Fried, Frank, Harris, Shriver & Jacobson, New York City, Shackleford, Farrior, Stallings & Evans, Tampa, Fla., of counsel.

Donald Wolfe, Jr., and Charles S. Crompton, Jr. (argued), of Potter, Anderson & Corroon, Wilmington, Del., for defendants; Robert B. Hirsch, James P. Mercurio, Salvatore A. Romano, and Howard B. Possick, of Arent, Fox, Kintner, Plotkin & Kahn, Washington, D.C., of counsel.

## MEMORANDUM OPINION

LONGOBARDI, District Judge.

The Plaintiff, Jack Eckerd Corporation ("Eckerd"), brought this action claiming that the Defendant, Dart Group Corporation ("Dart"), is violating the federal securities laws by filing a false and misleading Schedule 13D and by conducting a "creeping tender offer" to gain control of Eckerd. Currently before the Court is Dart's motion to disqualify the firm of Fried, Frank, Harris, Shriver & Jacobson ("Fried, Frank") from acting as attorneys for Eckerd because of the firm's alleged prior relationship with Dart.

## BACKGROUND

The basis for this motion is Fried, Frank's role in Dart's acquisition of stock in the May Department Store Corporation ("May"). In June, 1984, Dart sold its Dart Drug Store Division for approximately 160 million dollars. The proceeds of this sale represented more than half of Dart's total assets. As a means of investing these funds, Dart began acquiring May shares in late 1984 and hired the First Boston Corporation ("First Boston"), an investment banking firm, as financial advisor concerning the acquisition of May. Fleischer Supplemental Affidavit, Docket Item ("D.I.") 50, Exhibit A. As part of its agreement with First Boston, Dart agreed to reimburse First Boston "for its out-of-pocket expenses, including fees and expenses of its counsel or any other advisor or consultant retained by First Boston with the prior approval of Dart." *Id.* In November, 1984, First Boston retained Fried, Frank as its legal counsel. Fleischer Affidavit, D.I. 29, ¶ 3. Dart was represented throughout this period by its regular outside counsel, the firm of Arent, Fox, Kintner, Plotkin & Kahn ("Arent, Fox").

An important consideration in Dart's investment strategy was to avoid becoming subject to regulation as an "investment company" under the Investment Company Act of 1940 ("the 1940 Act"), 15 U.S.C. § 80a–1 *et seq.* The definition of "investment company" is given in 15 U.S.C. § 80a–3(a) and includes a company which owns investment securities having a value exceeding 40% of its total assets and which meets certain other requirements.[1] Since the proceeds from Dart's sale of its Drug Store Division represented over half of Dart's total assets, it faced the risk of becoming subject to regulation as an investment company if it used those proceeds to acquire additional investment securities. The law provides exemptions, however, one of which is for a company that engages, directly or through a wholly owned subsidiary or subsidiaries, in a non-investment business. 15 U.S.C. § 80a–3(b)(1).

In December, 1984, an associate at Fried, Frank prepared a memorandum discussing Dart's potential regulatory problems under the 1940 Act. A copy of this memorandum has been submitted to the Court for *in camera* inspection. The memorandum is 38 pages long with 11 pages of tables and charts. It refers to Dart as "client" and contains a specific detailed discussion of Dart's exposure to regulation under the 1940 Act. After discussing these difficulties, the memorandum suggests nine alternative means of avoiding investment company status, some of which are quite sophisticated.

The memorandum calculates the exact amounts of May stock which could be purchased by Dart without any corporate changes and also calculates how much additional stock could be purchased under some of the proposed alternatives. In order to obtain the figures used in these calculations, Fried, Frank requested permission from Arent, Fox to contact Dart directly. After permission was granted, Fried, Frank requested and received the figures directly from Dart.

The memorandum was addressed to the "April Group" which was a group of lawyers at Fried, Frank who were working on

---

1. (a) When used in this subchapter, "investment company" means any issuer which—

(1) is or holds itself out as being engaged primarily, or proposes to engage primarily, in the business of investing, reinvesting, or trading in securities;

(2) is engaged or proposes to engage in the business of issuing face-amount certificates of the installment type, or has been engaged in such business and has any such certificate outstanding; or

(3) is engaged or proposes to engage in the business of investing, reinvesting, owning, holding, or trading in securities, and owns or proposes to acquire investment securities having a value exceeding 40 per centum of the value of such issuer's total assets (exclusive of Government securities and cash items) on an unconsolidated basis.

As used in this section, "investment securities" includes all securities except (A) Government securities, (B) securities issued by employees' securities companies, and (C) securities issued by majority-owned subsidiaries of the owner which are not investment companies.

the May acquisition. Raymond Affidavit, ¶ 2. Fried, Frank sent copies of the memorandum to First Boston and Arent, Fox but not to Dart. Fleischer Affidavit, D.I. 29, ¶ 11; Fleischer Supplemental Affidavit, D.I. 50, Exhibits B and C. Dart later received a copy of the report indirectly.

In March, 1985, Dart abandoned its interest in May and sold all of its May shares. Haft Affidavit, D.I. 17, ¶ 1. Dart then terminated its relationship with First Boston, and Fried, Frank ceased its representation of First Boston with regard to the May acquisition.

In late May, 1985, Eckerd noticed unusually heavy trading in its stock and suspected an attempted takeover. Eckerd retained Fried, Frank to represent it in dealing with the problem. At the time, Eckerd was not certain who was buying its shares but there were rumors that it might be Dart. Raab Affidavit, D.I. 30, ¶ 5. On June 5, 1985, Dart filed a Schedule 13D revealing that it owned more than 5% of the shares of Eckerd. Complaint, D.I. 1, Exhibit A. In the 13D filing, Dart stated that, beginning on May 21, it had acquired almost 1.9 million shares "solely for investment." *Id.* at p. 4. Dart further stated that on June 1, 1985, its Board of Directors met to review its investment in Eckerd and determined to evaluate the matter further. As a result of this developing evaluation, the 13D continues, Dart may decide to buy all or part of the outstanding shares of Eckerd or, alternatively, it may decide to sell all or part of the shares already purchased.

On June 10, 1985, Eckerd filed this action charging that the Schedule 13D filed by Dart was false and misleading, in violation of the Securities Exchange Act of 1934. Eckerd charged that Dart had already decided to seek control of Eckerd and that its statement that the shares were acquired "solely for investment" was false and misleading. As part of its support for this contention, Eckerd points to Dart's need to acquire control of a company rather than merely investing in it in order to avoid becoming subject to regulation as an "investment company" under the 1940 Act. Complaint, D.I. 1, ¶ 16(a)

Eckerd's complaint further alleges that Dart's failure to disclose its need to acquire an operating company in order to avoid regulation under the 1940 Act is, in itself, a material omission. The complaint goes on to allege various other material misrepresentations and omissions in the 13D filing and also contends that Dart is conducting a "creeping tender offer" in violation of section 14(d) of the Securities Exchange Act.

The same day that the complaint was filed, June 10, 1985, Robert B. Hirsch, a partner in Arent, Fox and counsel for Dart, spoke to Arthur Fleischer, a partner in Fried, Frank, and requested that Fried, Frank withdraw voluntarily as counsel for Eckerd because of its prior role in Dart's attempted acquisition of May. Certificate of Robert B. Hirsch, D.I. 16. The move was not a complete surprise. Fried, Frank had been aware of the potential conflict since some time before June 5 but had concluded that it could properly represent Eckerd. Raab Affidavit, D.I. 30, ¶¶ 6–8. Although it did not consider itself bound to do so, Fried, Frank had put up a "Chinese Wall" which denied its attorneys who were working for Eckerd access to the non-public information supplied by Dart. *Id.* ¶ 8(d). Fried, Frank declined to withdraw voluntarily. On June 13, 1985, Dart moved to disqualify Fried, Frank as counsel for Eckerd.

## MOTION TO DISQUALIFY

In *In Re Corn Derivatives Antitrust Litigation,* 748 F.2d 157, 160–62 (3d Cir. 1984), the court adopted Rule 1.9 of American Bar Association Model Rules of Professional Conduct as the appropriate standard for disqualifying an attorney from representing interests adverse to a former client. Rule 1.9 provides that:

A lawyer who has formerly represented a client in a matter shall not thereafter:
(a) represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client

unless the former client consents after consultation

Here, the interests of Eckerd are directly adverse to those of Dart. Therefore, Fried, Frank must be disqualified from representing Eckerd if the subject matter of this litigation is "the same or substantially related" to the facts, plan or processes relative to the acquisition of May and if Dart can be considered a former client of Fried, Frank.

Fried, Frank contends that its analysis of the 1940 Act in connection with the May acquisition is not substantially related to the claims of misrepresentation in Dart's Schedule 13D, even though two of these claims are based on the 1940 Act. Fried, Frank argues that whether a Schedule 13D is misleading depends on the acquiror's specific intent regarding the target. Since the alleged target in this litigation, Eckerd, is different than the target in the previous matter, May, the two matters are not substantially related. Fried, Frank further contends that the financial data it obtained in connection with the May acquisition, a matter of importance in determining how much money could be utilized for acquisition purposes, is now out of date and is no longer useful in this litigation.

 The standard for determining whether the current matter is substantially related to the former representation is "whether it can reasonably be said that in the course of the former representation the attorney might have acquired information related to the subject matter of his subsequent representation." *Richardson v. Hamilton International Corporation*, 469 F.2d 1382, 1385 (3d Cir.1972) (quoting *T.C. Theatre Corp. v. Warner Bros. Pictures*, 113 F.Supp. 265, 269 (S.D.N.Y.1953)), *cert. denied*, 411 U.S. 986, 93 S.Ct. 2271, 36 L.Ed.2d 964 (1973); *See, also, Kevlik v. Goldstein*, 724 F.2d 844, 851 (1st Cir.1984) and cases cited therein. Here, it is undisputed that Fried, Frank acquired confidential information from Dart during the May acquisition and further that Fried, Frank requested and received financial informa-

tion from Dart in order to prepare its memorandum.

Fried, Frank's attempts to distinguish the two matters are unpersuasive. Although the targets are different, this is of little significance in evaluating the 1940 Act as it applies to Dart. Dart may be subject to regulation under the 1940 Act because of its own financial structure, not because of the specific characteristics of the target. For this reason, the memorandum prepared by Fried, Frank in the May acquisition discusses the specific characteristics of Dart, not May, and much of it would be equally applicable to the Eckerd lawsuit. The financial data which Fried, Frank acquired during the May acquisition, although no longer completely up to date, may still be extremely useful. Moreover, only a cursory perusal of the memorandum leads one to conclude that it could easily be construed as a blueprint for opposing any takeover attempt by Dart. Indeed, it is obvious that much of Dart's acquisition plans and tactics could be anticipated. Dart's basic problem in dealing with the 1940 Act arises from the sale of its Drug Store Division in 1984 and this has not changed fundamentally between the May acquisition and the present. Further, in *Richardson*, the court disqualified an attorney based on his access to his former client's finances, corporate structure and operations even though the former representation had concluded four years previously. In this case, by contrast, only two months elapsed between the conclusion of the May acquisition and Eckerd's retention of Fried, Frank. The Court accordingly concludes that the two matters are substantially related.

 Whether Dart was ever a client of Fried, Frank is an issue that is more difficult to establish. It is undisputed that there was no express agreement for Fried, Frank to act as attorney for Dart in the May acquisition. Thus, the issue is whether an intent to create an attorney-client relationship can be implied from the conduct of the parties. *See, Connelly v. Wolf, Block, Schorr and Solis-Cohen,* 463

F.Supp. 914, 919 (E.D.Pa.1978); *E.F. Hutton & Company v. Brown*, 305 F.Supp. 371 (S.D.Tex.1969).

The parties have pointed to two different standards as the appropriate means of determining whether an attorney-client relationship was formed. Fried, Frank points to dictum in the Third Circuit's opinion in *Committee on Professional Ethics & Griev. v. Johnson*, 447 F.2d 169, 174 (3d Cir.1971), which stated that "[a]n attorney client relationship is one of agency and arises only when the parties have given their consent, either express or implied, to its formation." *Committee on Professional Ethics* dealt with the appeal of an attorney, Johnson, who had been disbarred for unethical conduct in connection with a real estate transaction. One of the charges against him was that he made material misrepresentations and omissions in dealing with two prospective purchasers, Richardson and Santana, while they were his clients. The district court did not find that Johnson was acting as the attorney for Richardson and Santana but held that he should be disbarred anyway because he violated duties he owed to them as parties. The Third Circuit reversed holding that Johnson's due process rights had been violated because he had not received notice of the violations for which he was disbarred. The Court of Appeals thus had no occasion to consider whether an attorney-client relationship was actually formed because no such finding was made by the district court.

Dart points to the standard formulated by the Seventh Circuit in *Westinghouse Elec. Corp. v. Kerr-McGee Corp.*, 580 F.2d 1311, *cert. denied*, 439 U.S. 955, 99 S.Ct. 353, 58 L.Ed.2d 346 (1978). In *Westinghouse*, the court cogently reasoned that the attorney-client relationship could be formed in situations that did not satisfy the formal rules of agency. For example, the attorney-client relationship extends to preliminary consultation by a prospective client with a view to retention of the attorney although actual employment does not result. *Id.* at 1319. The court went on to hold that an attorney-client relationship arises whenever a lay party submits confidential information to a lawyer with the reasonable belief that the lawyer is acting as his attorney.

The Court finds the Seventh Circuit's reasoning persuasive and believes that the Third Circuit would adopt this position if it were squarely faced with the question. Since the dictum in *Committee on Professional Ethics* remains the Third Circuit's only pronouncement on the subject, however, the Court will discuss the application of both standards to this issue.

In determining whether an attorney-client relationship can be implied, the Court must examine two alternative means of creating this relationship. First, the Court must determine whether the direct dealings between Dart and Fried, Frank imply an attorney-client relationship. Second, the Court must determine whether First Boston was acting as the agent for Dart when it retained Fried, Frank as its attorney.

■ As discussed above, when Fried, Frank prepared the memorandum on the 1940 Act, it contacted Arent, Fox and then Dart directly to obtain the necessary corporate data. Fried, Frank then used this data to prepare a detailed analysis of the 1940 Act as it applied specifically to Dart's proposed acquisition of May. The memorandum was not merely a matter of inserting Dart's financial data into statutory definitions of investment companies. Instead, it involved a sophisticated legal analysis specifically and uniquely tied to Dart and Dart's acquisition problems. This situation falls squarely within the holding in *Westinghouse* in that Dart supplied confidential information to Fried, Frank for the purpose of obtaining professional legal services. Considering the attendant circumstances in this case, it was not unreasonable for Dart to assume that Fried, Frank was acting as its attorney. Furthermore, it is irrelevant whether Fried, Frank thought it was acting as Dart's attorney. *Westinghouse*, 580 F.2d at 1319 n. 14.

Even if the more stringent agency test of *Committee on Professional Ethics* is

adopted, the result in this case would be the same. As that court noted, an agency relationship can be created by implied consent on both sides. The Court finds that the actions by Dart in supplying data to be used in a detailed analysis of a specific legal problem facing Dart at the time, and the actions by Fried, Frank in preparing the report fairly, imply the consent of both parties to the formation of an attorney-client relationship.

■ Even if this direct connection between Dart and Fried, Frank were lacking, there is also the possibility that First Boston was acting as the agent for Dart when it retained Fried, Frank. It is well established that an agent can retain an attorney for his principal. *See, e.g., Matter of King Resources,* 20 B.R. 191 (D.Colo.1982); *Abodeely v. Cavras,* Iowa Supr., 221 N.W.2d 494 (1974); *Lake Shore Management Co. v. Blum,* 92 Ill.App.2d 47, 235 N.W.2d 366 (1968). Fried, Frank contends that First Boston was acting as an independent contractor when it retained Fried, Frank. However, the terms "agent" and "independent contractor" are not mutually exclusive. Most of the persons known as agents, such as brokers, factors or attorneys, are also independent contractors. *Restatement (Second) of Agency,* Comment to § 14N. Although not subject to the physical control of their principal, these persons are fiduciaries and owe the principal the obligations of loyalty and obedience. *Id.*

■ The Restatement lists three fundamental characteristics of an agency relationship. *Restatement (Second) of Agency* §§ 12–14. The "touchstone" of the agency relationship is the principal's right to control the agent. *Government of Virgin Islands v. Richards,* 618 F.2d 242, 244 (3d Cir.1980) (citing *Restatement (Second) of Agency* § 14). In this case, the agreement between First Boston and Dart required First Boston to obtain the prior approval of Dart before it retained counsel or any other advisor or consultant. Supplemental Fleischer Affidavit, Exhibit A. Thus, the

element of control by Dart points to the existence of an agency relationship.

■ A second element is that an agent is a fiduciary who works on behalf of the principal and primarily for his benefit. *Westinghouse Elec. Corp. v. Rio Algom Ltd.,* 448 F.Supp. 1284, 1301 (N.D.Ill.1978) (citing *Restatement (Second) of Agency* §§ 1, 13), *rev'd in part on other grounds sub nom., Westinghouse Elec. Co. v. Kerr-McGee Corp.,* 580 F.2d 1311 (7th Cir.1978). In examining this element, it is important to distinguish among the various tasks performed by Fried, Frank. As Fried, Frank has pointed out, the interests of Dart could have been adverse to those of First Boston in a variety of circumstances. Fleischer Affidavit, D.I. 29, ¶¶ 5–6. For example, as counsel to First Boston, Fried, Frank reviewed the retainer agreement between Dart and First Boston. *Id.* In the event of a dispute between First Boston and Dart over the retainer agreement, Fried, Frank would have been obligated to protect the interests of First Boston. In assigning such tasks to Fried, Frank, First Boston was acting to protect its own interests, not those of Dart, and, thus, it was obviously not acting as the agent of Dart.

The situation is entirely different, however, when examining such issues as the memorandum on the 1940 Act. In this case, First Boston was acting on behalf of Dart's interests, not its own. In such a case, First Boston is acting as the agent of Dart in consulting with Fried, Frank. The multiple hats posed no legal or ethical problems until a conflict would have required Fried, Frank to resolve their dilemma.

■ Finally, the third basic element of agency is that the agent has the power to alter the legal relations between the principal and third persons or the principal and himself. *Restatement (Second) of Agency* § 12. In this case, the agreement between Dart and First Boston provides that if, with the prior approval of Dart, First Boston hired an attorney or other advisor, Dart became liable to reimburse First Boston for any fees paid. Accordingly, First Boston had the power to obligate

Dart to pay legal fees. Thus, all three elements of agency support the inference that First Boston was acting as the agent for Dart when it retained Fried, Frank to prepare a legal analysis of the 1940 Act issues.

For all of the reasons discussed above, the Court concludes that Fried, Frank was acting as the attorney for Dart when it prepared the memorandum regarding the 1940 Act. This conclusion is bolstered by the conduct of Eckerd's own attorneys in this litigation. Eckerd has retained the investment banking firm of Goldman, Sachs as an advisor in this litigation. Goldman, Sachs has hired the firm of Simpson, Thacher & Bartlett as its counsel. At a recent deposition of an Eckerd executive, attorneys for Dart attempted to question the executive about the substance of legal advice given by an attorney from Simpson, Thacher at a meeting of the Eckerd Board of Directors. Eckerd's attorney objected on the grounds of attorney-client privilege. D.I. 45, Exhibit A. This indicates that attorneys, as well as laymen, share the perception that when an attorney for an investment banker gives legal advice to the investment banker's client on matters concerning the client's legal problems, he is acting as attorney for the investment banker's client and his communications are privileged.

 Finally, the Court believes that the policy considerations underlying Rule 1.9 of the Model Rules of Professional Conduct support disqualification. As Judge Seitz noted in *In Re Corn Products Derivatives Antitrust Litigation*, 748 F.2d at 162, an important consideration is the maintenance of public confidence in the integrity of the Bar. In order to maintain this confidence, lawyers are held to higher standards of loyalty and integrity than other fiduciaries. As the circumstances of this case make clear, a layman often consults with his investment banker's attorney under circumstances indistinguishable from those in which he consults his own attorney. He expects the investment banker's attorney to exercise the same professional judgment and to display the same loyalty as his own attorneys. If the investment banker's attorney, after receiving confidential information and encouraging the client to confide in him, then switches sides in a related matter, the outrage and betrayal felt by the client could not be said to be unreasonable. In order to maintain the public confidence in the Bar, it is essential for attorneys to avoid situations that pose these apparent conflicts.

Fried, Frank objects that extending the disqualification rule to cover this situation will result in numerous disqualifications in many tender offer situations. There are two aspects to this concern: the effect on the law firm which is deprived of clients and the effect on the client which is deprived of the counsel of its choice. The effect on the law firm is of little moment when the benefits and the burdens of professional responsibility are weighed against the demands of the market place. This is not to deny the need for the law firm to be able to attract and represent clients in its field of expertise. However, law firms can deal with this problem by appropriate circumspection in their choice of clients and in the areas in which they agree to represent those clients. A more significant consideration is the potential effect on the client.

 Eckerd contends that it will be prejudiced if it is deprived of its choice of counsel. The Third Circuit has often employed a balancing test which weighs the litigant's interest in the counsel of its choice against the policies served by the disqualification rule. *In Re Corn Derivatives Antitrust Litigation*, 748 F.2d at 162; *United States v. Miller*, 624 F.2d 1198, 1201 (3d Cir.1980). In this case Eckerd is represented by two large and distinguished law firms apart from Fried, Frank and the Court is informed that it has been consulting a third law firm on the 1940 Act allegations. Further, as discussed above, Fried, Frank has been aware of the potential conflict of interest since the first days of its representation of Eckerd and, thus, has had the opportunity to mitigate the effects of disqualification by taking appropriate

precautions. Finally, Dart raised the issue of disqualification promptly by calling Fried, Frank on the same day this lawsuit was filed and by filing this motion only three days later. The Court accordingly finds that the prejudice to Eckerd is outweighed by the need for disqualification in this case.

Finally, Fried, Frank cites the decision in *In Re John Doe Corp.*, 675 F.2d 482 (2d Cir.1982), as supporting its contention that an attorney for an investment banker does not represent the investment banker's client. "Doe Corp." was the pseudonym used by the court to refer to a company which was being investigated by a grand jury. An attorney for Doe Corp.'s underwriter demanded that the company disclose a certain report to him so that he could determine whether a Registration Statement and prospectus filed with the SEC contained material misrepresentations or omissions. The attorney informed the company that if they failed to give him the report, he would so inform the underwriter which would then decide on whether or not to proceed with the offering. The court held that this disclosure to the underwriter's attorney waived the attorney-client privilege with regard to the report.

*John Doe Corp.* is distinguishable for two reasons. First, as the court noted, the disclosure to the underwriter's attorney was not for the purpose of seeking legal advice. 675 F.2d at 489. Second, the underwriter's attorney was clearly representing the interests of the underwriter, not Doe Corp., when he demanded disclosure of the report. Under such circumstances, there is no attorney-client relationship between the corporation and the underwriter's attorney. *John Doe Corp.* is not applicable to this case nor does it conflict with the decisions of other Courts of Appeals which support the conclusion that Fried, Frank must be disqualified. *See, Wilson P. Abraham Const. v. Armco Steel Corp.*, 559 F.2d 250 (5th Cir.1977); *Analytica, Inc. v. NPD Research, Inc.*, 708 F.2d 1263, 1268–69 (7th Cir.1983).

## CONCLUSION

 For all of the foregoing reasons, Fried, Frank must be disqualified from representing Eckerd in this litigation. Dart's further application to disqualify Fried, Frank from any future litigation involving the acquisition of Eckerd shares by Dart is premature. The necessity for such disqualification depends upon the subject matter of such litigation and the Court declines to speculate on such hypothetical possibilities.