# COURT OF CHANCERY
## OF THE
## STATE OF DELAWARE

ANDRE G. BOUCHARD
CHANCELLOR

LEONARD L. WILLIAMS JUSTICE CENTER
500 N. KING STREET, SUITE 11400
WILMINGTON, DELAWARE 19801-3734

Date Submitted: October 17, 2017
Date Decided: November 21, 2017

William M. Lafferty, Esquire
Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street
Wilmington, DE 19801

David E. Ross, Esquire
Ross Aronstam & Moritz LLP
100 S. West Street, Suite 400
Wilmington, DE 19801

Jeffrey L. Moyer, Esquire
Richards Layton & Finger P.A.
One Rodney Square
920 N. King Street
Wilmington, DE 19801

Stephen E. Jenkins, Esquire
Ashby & Geddes
500 Delaware Avenue
Wilmington, DE 19899

Elena C. Norman, Esquire
Young Conaway Stargatt & Taylor, LLP
Rodney Square
100 North King Street
Wilmington, DE 19801

> RE: ***Dollar Tree, Inc., et al. v. Dollar Express LLC, et al.***
> Civil Action No. 2017-0411-AGB

Dear Counsel:

This letter constitutes the Court's decision on a joint motion that defendants

and intervenor Duff & Phelps, LLC filed to disqualify Morris, Nichols, Arsht &

Tunnell LLP ("MNAT") from representing plaintiffs in this action. For the reasons

explained below, the motion to disqualify is denied.

## I.     Background

Sycamore Partners Management, L.P. ("Sycamore") is a private equity firm. At the times relevant to this motion, SP Dollar Holdings, Ltd. ("SP Dollar") was an indirect subsidiary of Sycamore, and Dollar Express LLC ("Dollar Express") was an indirect subsidiary of SP Dollar.  In 2015, Dollar Express acquired approximately 330 discount stores from Family Dollar Stores, Inc. ("Family Dollar") when Family Dollar merged with Dollar Tree, Inc. ("Dollar Tree").

Family Dollar, Dollar Tree, and certain of their affiliates are plaintiffs in this action; Sycamore, SP Dollar, Dollar Express, and certain of their affiliates are defendants.  Duff & Phelps intervened for the limited purpose of joining defendants in filing the motion to disqualify MNAT from representing plaintiffs in this action.

### A.     MNAT Provides Legal Advice in Connection with Dollar Express' Issuance of a Dividend to Sycamore

In early 2016, as part of a series of transactions, Dollar Express contemplated issuing a dividend of approximately $30 million to Sycamore (the "Dividend").  As reflected in an engagement letter dated April 6, 2016, SP Dollar, on behalf of itself and its subsidiaries, engaged Duff & Phelps to provide a solvency analysis and opinion concerning the Dividend.  The engagement letter states that Duff & Phelps would use any "non-public or proprietary information . . . solely in the course of this Engagement and in a manner which Duff & Phelps believes in good faith is

2

consistent with the Company Group's interests or is required by law."[1] It also authorizes Duff & Phelps to retain outside counsel for the engagement and provides that SP Dollar and its subsidiaries would reimburse Duff & Phelps for the reasonable fees and expenses of such counsel.

In April 2016, Duff & Phelps retained MNAT to provide legal advice on the solvency work it performed for SP Dollar (the "Duff & Phelps Matter"). MNAT's engagement letter, which Duff & Phelps signed on April 14, 2016, states that MNAT had been selected as "Delaware counsel to represent Duff & Phelps, LLC in connection with its engagement as independent financial advisor to SP Dollar Holdings Ltd. and certain of its affiliates."[2]

According to a May 3, 2016 invoice MNAT sent to Duff & Phelps, three MNAT attorneys (two partners and one associate) worked on the Duff & Phelps Matter over the course of approximately one week, from April 6, 2016 to April 15, 2016. They billed a total of 12.20 hours of time, with the two partners billing less than four hours each and the associate billing 4.60 hours.[3]

---

[1] Mot. to Disqualify Ex. B at 8. "Company Group" is defined to mean SP Dollar and certain of its subsidiaries. *Id.* at 1.

[2] Transmittal Affidavit of S. Mark Hurd ("Hurd Aff.") Ex. G at 1.

[3] Mot. to Disqualify Ex. D at SYC0011317.

MNAT's invoice reflects that it assisted in revising Duff & Phelps' engagement letter with SP Dollar and in reviewing and advising Duff & Phelps on a board book and a solvency opinion letter.[4] The board book contained, among other things, financial information concerning Dollar Express, an organization chart, a description of the proposed transaction, and various analyses.[5]

On April 19, 2016, Duff & Phelps provided its solvency analysis and opinion to SP Dollar. Duff & Phelps concluded that "[t]he assets of each of the Delaware Entities, at a Fair Valuation, exceed its respective Debts (including Contingent Liabilities)," and that "[e]ach of the Delaware Entities should be able to pay its respective Debts (including Contingent Liabilities) as they become due."[6] The solvency opinion also concluded that "[n]one of the Delaware Entities will have an unreasonably small amount of assets (or capital) for the businesses in which it is

---

[4] *Id.* at SYC0011318. According to MNAT, more than half of the time it billed (6.40 hours) involved the engagement letter between Duff & Phelps and SP Dollar. Resp'ts Opp'n Br. at 4.

[5] Mot. to Disqualify Ex. C.

[6] Mot. to Disqualify Ex. A at 7. "Delaware Entities" is defined to mean SP Dollar Holdco LLC, SP Dollar Intermediate Holdco LLC, Dollar Express LLC, and Dollar Express Stores LLC. *Id.* at 2. Each of these entities is a subsidiary of SP Dollar.

engaged or in which management has indicated it intends to engage."[7]  Sometime thereafter, the Dividend was issued to Sycamore.

Duff & Phelps paid MNAT for the work it did on the Duff & Phelps Matter.[8] The last time MNAT performed any work for Duff & Phelps on any matter was on August 26, 2016.[9]

## B.  MNAT Files the Present Action on Behalf of Plaintiffs

On June 1, 2017, MNAT filed an eighteen-count Verified Complaint on behalf of plaintiffs in this action alleging that defendants deliberately failed to pay for tens of millions of dollars of goods and services they purchased from plaintiffs in connection with operating the 330 discount stores that Dollar Express acquired from Family Dollar in 2015.  Relevant to this motion, some of the counts allege that the Dividend was a fraudulent transfer and an illegal distribution under 6 *Del. C.* § 18-607.[10]

On September 6, 2017, counsel for defendants discovered MNAT's May 2016 invoice to Duff & Phelps and thus learned that MNAT had provided legal advice to

---

[7] *Id.* at 7.

[8] Hurd Aff. ¶ 7.

[9] *Id.*

[10] Compl. ¶¶ 113-123.

Duff & Phelps regarding its solvency analysis and opinion for the Dividend.[11]  On September 7, 2017, defendants' counsel contacted MNAT and asked it to withdraw from this action.[12]  That same day, S. Mark Hurd, MNAT's General Counsel, instructed MNAT personnel to implement an ethical wall between the Duff & Phelps Matter and this action.[13]

Hurd investigated the alleged conflict, personally interviewing the two MNAT partners who worked on the Duff & Phelps Matter.[14]  The two confirmed that they have had no involvement in this action and that they have not discussed the substance of their work for the Duff & Phelps Matter with the MNAT attorneys involved in this action.[15]  Hurd also confirmed that the MNAT attorneys involved in this action have not discussed any confidential information regarding MNAT's prior work in the Duff & Phelps Matter with the MNAT attorneys who were involved in

---

[11] Mot. to Disqualify ¶ 12.

[12] Hurd Aff. ¶ 2.

[13] *Id.*

[14] Hurd Aff. ¶ 8.  The third MNAT attorney who worked on the Duff & Phelps Matter left the firm before this action was filed.

[15] *Id.*

the Duff & Phelps Matter, nor have they accessed any of the records from the Duff & Phelps Matter.[16]

As part of his investigation, Hurd instructed IT personnel at MNAT to examine the electronic files from the Duff & Phelps Matter. That examination confirmed, consistent with Hurd's interviews, that none of the MNAT attorneys who has appeared in this action ever accessed any confidential information from the records in the Duff & Phelps Matter.[17]

On September 20 and 21, 2017, movants sent letters to MNAT explaining why they believed MNAT was obligated to withdraw from representing plaintiffs in this action.[18] On September 25, 2017, MNAT sent letters to movants' counsel, formally refusing to withdraw.[19] In these letters, MNAT asserted that the Duff & Phelps Matter is not "substantially related" to the matters at issue in this action and explained measures it had implemented to protect Duff & Phelps' confidences:

> The Morris Nichols lawyers involved in the Dollar Tree Litigation were not involved in the Duff & Phelps matter, have not accessed the file from the Duff & Phelps matter nor discussed any confidential information from that representation with the attorneys who were involved in it, and have been formally screened from access since early

---

[16] *Id.*

[17] Hurd Aff. ¶ 9.

[18] Hurd Aff. Exs. A, C, D.

[19] Mot. to Disqualify Ex. F; Hurd Aff. Exs. E, F.

September, when your clients first expressed their views that there was a potential conflict.[20]

MNAT further stated that it had advised Duff & Phelps that it would not examine Duff & Phelps in connection with this litigation, leaving that task to "be conducted exclusively by other counsel," and denied the existence of any implied attorney-client relationship between MNAT and any of the defendants.[21]

On September 29, 2017, the Court granted Duff & Phelps' unopposed motion to intervene in this action. That same day, defendants, joined by Duff & Phelps, moved to disqualify MNAT.

## II. Analysis

Rule 1.9(a) of the Delaware Lawyers' Rules of Professional Conduct (the "Rules") provides as follows: "A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in

---

[20] Mot. to Disqualify Ex. F at 1-2.

[21] *Id.*

writing." Impermissible conflicts arising under the Rules generally are imputed and apply to a lawyer's entire firm, and not just to a lawyer individually.[22]

### A.    Parties' Contentions

Movants contend that MNAT violated Rule 1.9 in two respects for which it must be disqualified. First, they argue that an *implied* attorney-client relationship was formed between MNAT and defendants because MNAT received defendants' confidential information in the Duff & Phelps Matter. They contend that it would be improper for MNAT to have *implicitly* advised defendants on the validity of the Dividend in the Duff & Phelps Matter, but now attack the Dividend as impermissible. Second, movants argue that MNAT's participation in this action violates its duty of loyalty owed to Duff & Phelps and merits disqualification because MNAT's representation of plaintiffs in this action would require MNAT to discredit the same work on which it advised Duff & Phelps.

MNAT denies that it had an attorney-client relationship with defendants arising from the Duff & Phelps Matter and contends that its representation of plaintiffs in this action does not violate duties it owes to Duff & Phelps under Rule 1.9. MNAT further contends that, even if its participation in this action were to

---

[22] Del. Lawyers' Rules of Prof'l Conduct R. 1.10(a); *Bleacher v. Bose*, 2017 WL 1854794, at *2 (Del. Super. Ct. May 3, 2017).

amount to a technical violation of the Rules, its continued involvement does not undermine the legitimacy of this judicial proceeding such that it should be disqualified from representing the plaintiffs.

I consider the movants' two arguments, in turn, below.

### B.  There Was No Implied Attorney-Client Relationship Between MNAT and Defendants

"In the absence of an express contract or formal retainer agreement, determining the existence of an attorney-client relationship is a fact-intensive inquiry that depends on the circumstances of each case.  In determining the existence of an attorney-client relationship, courts look at the contacts between the potential client and its potential lawyers to determine whether it would have been reasonable for the 'client' to believe that the attorney was acting on its behalf as its counsel."[23]

Based on my review of the record, including documents submitted *in camera,* I find it would not have been reasonable for defendants to have believed that MNAT was acting as their counsel in connection with the Duff & Phelps Matter.  To start, defendants were represented by separate legal counsel in connection with the Dividend before MNAT became involved.  Duff & Phelps thereafter reached out to

---

[23] *Benchmark Capital Partners IV, L.P. v. Vague*, 2002 WL 31057462, at *3 (Del. Ch. Sept. 3, 2002) (citations omitted).

have MNAT represent it separately.[24]   As this Court has recognized on multiple occasions, the prior retention of separate legal counsel is a factor that counts against the formation of a subsequent implied attorney-client relationship.[25]   Additionally, the engagement agreement between Duff & Phelps and SP Dollar was explicit that Duff & Phelps, and not SP Dollar, would engage legal counsel to advise on its solvency analysis and solvency opinion.[26]   This Court has viewed the fact that a purported client did not ask a law firm to represent it as a factor counting against the formation of an attorney-client relationship.[27]

Movants invoke *Jack Eckerd Corp. v. Dart Grp. Corp.* for the proposition that "an attorney-client relationship arises whenever a lay party submits confidential information to a lawyer with the reasonable belief that the lawyer is acting as his attorney."[28] This argument fails here on two levels.   First, the submission of confidential information to a lawyer does not automatically form an implied

---

[24] Transmittal Affidavit of Patricia O. Vella ("Vella Aff.") Ex. 1.

[25] *See, e.g.*, *Benchmark*, 2002 WL 31057462, at *3; *Delaware Trust Co. v. Brady*, 1988 WL 94741, at *3 (Del. Ch. Sept. 14, 1988) (Allen, C.).

[26] Mot. to Disqualify Ex. B at 5 ("[T]he Consolidated Company agrees to promptly reimburse Duff & Phelps . . . for reasonable documented fees and expenses of outside counsel *retained by Duff & Phelps*.") (emphasis added).

[27] *Brady*, 1988 WL 94741, at *3.

[28] 621 F. Supp. 725, 731 (D. Del. 1985).

attorney-client relationship under Delaware law.[29] Second, and more importantly, it would not have been reasonable in my view for defendants to have believed MNAT was their lawyer for the reasons explained above.

In sum, in my "realistic assessment of all aspects of the relationship,"[30] no implied attorney-client relationship was formed between defendants and MNAT. Thus, the purported relationship between defendants and MNAT does not provide a basis for seeking to disqualify MNAT from representing plaintiffs in this action. I consider next MNAT's relationship with its former client Duff & Phelps.

## C. Movants Have Failed to Establish that MNAT's Representation of Plaintiffs Would Prejudice the Fairness of the Proceedings

In *In re Appeal of Infotechnology, Inc.*, our Supreme Court made clear that a violation of the Delaware Lawyers' Rules of Professional Conduct is not sufficient by itself to warrant disqualification of counsel from an action, and that disqualification is appropriate *only* if the challenged conduct prejudices the fairness of the proceedings:

> While we recognize and confirm a trial court's power to ensure the orderly and fair administration of justice in matters before it, including the conduct of counsel, the Rules may not be applied in extra-

---

[29] *See Benchmark*, 2002 WL 31057462, at *3 (citing *Brady*, 1988 WL 94741, at *3) ("While courts have recognized that a client's submission of confidential information to an attorney is an important factor in this inquiry, that factor alone is not controlling.").

[30] *Brady*, 1988 WL 94741, at *3.

> disciplinary proceedings solely to vindicate the legal profession's concerns in such affairs. *Unless the challenged conduct prejudices the fairness of the proceedings*, such that it adversely affects the fair and efficient administration of justice, *only this Court has the power and responsibility to govern the Bar*, and in pursuance of that authority to enforce the Rules for disciplinary purposes.[31]

The Supreme Court reaffirmed this rule more recently, holding that "[a]bsent conduct that prejudicially disrupts the proceeding, trial judges have no independent jurisdiction to enforce the Rules of Professional Conduct."[32]

The rule adopted in *Infotechnology* recognizes that ethical rules "are not to be subverted as procedural weapons."[33] Accordingly, "disqualification of counsel is an extreme remedy that should be employed only when necessary to ensure the fairness of the litigation process."[34]

---

[31] 582 A.2d 215, 216-17 (Del. 1990) (emphasis added).

[32] *Crumplar v. Superior Court ex rel. New Castle Cty.*, 56 A.3d 1000, 1009 (Del. 2012).

[33] *Infotechnology*, 582 A.2d at 220. *See also Rohm & Hass Co. v. Dow Chem. Co.*, 2009 WL 445609, at *2 (Del. Ch. Feb. 12, 2009) (internal quotation omitted) ("Because of the risk that the ethical rules may be invoked by opposing parties as procedural weapons, courts impose a significant burden on the party seeking disqualification."); *Sanchez-Caza v. Estate of Whetsone*, 2004 WL 2087922, at *4 (Del. Super. Ct. Sept. 16, 2004) (citing *Acierno v. Hayward*, 2004 WL 1517134 (Del. Ch. July 1, 2004)) (noting that courts disfavor disqualification motions "because they are often filed for tactical reasons rather than bona fide concerns about client loyalty").

[34] *Fernandez v. St. Francis Hosp., Inc.*, 2009 WL 2393713, at *5 (Del. Super. Ct. Aug. 3, 2009).

"As a threshold matter, therefore, the court must consider whether the alleged violation of the Rules is sufficiently serious to prejudice the fairness of the proceeding.  If not, then the alleged violation falls within the jurisdiction of the Delaware Office of Disciplinary Conduct, not this court."[35]  When making this determination, the Court must weigh "the interests of the former client in protecting confidences revealed during representation with the prejudice that would be suffered by the current client were the attorney or firm be disqualified."[36]

The parties dispute what burden of proof should apply to establishing prejudice to the fairness of the proceedings.  MNAT points to cases holding that the burden is one of clear and convincing evidence.[37]  Movants argue that this heightened standard only applies to *non-client* litigants seeking disqualification of opposing counsel,[38] and that courts merely weigh the competing interests of the

---

[35] *Matter of Rehab. of Indem. Ins. Corp., RRG*, 2014 WL 637872, at *1 (Del. Ch. Feb. 14, 2014) (internal quotation marks and alterations omitted).

[36] *Express Scripts, Inc. v. Crawford*, 2007 WL 417193, at *1 (Del. Ch. Jan. 25, 2007).

[37] *See, e.g.*, *Dunlap v. State Farm Fire & Cas. Co.*, 950 A.2d 658, 658 (Del. 2008) (TABLE); *Matter of Rehab. of Indem. Ins. Corp., RRG*, 2014 WL 637872, at *1; *Postorivo v. AG Paintball Hldgs., Inc.*, 2008 WL 3876199, at *14 (Del. Ch. Aug. 20, 2008).

[38] *See Infotechnology*, 582 A.2d at 221 ("[W]e conclude that the burden of proof must be on the non-client litigant to prove by clear and convincing evidence (1) the existence of a conflict and (2) to demonstrate how the conflict will prejudice the fairness of the proceedings.").

14

former and current clients where, as here, a former client moves for disqualification.[39] I need not resolve this issue because, even under the less onerous balance-of-interests test that the movants advocate, I find that the prejudice that would be caused to plaintiffs if MNAT were disqualified outweighs Duff & Phelps' concerns.

Simultaneously with filing this action, plaintiffs filed a motion for expedition and the entry of a status quo order out of concern that defendants were diverting assets improperly to avoid paying a potentially substantial judgment. Shortly thereafter, the parties stipulated to entry of an expedited case schedule, with a five-day trial scheduled to begin in April 2018.[40] Since then, document production has been substantially completed and multiple motions have been fully briefed and presented to the Court. Disqualification of MNAT thus not only would deprive plaintiffs of their chosen counsel, but also undoubtedly would result in significant expense and delay to plaintiffs in a case that has been placed on an expedited track with the consent of all parties.[41]

---

[39] *See, e.g.*, *Rohm*, 2009 WL 445609, at *2; *Express Scripts*, 2007 WL 417193, at *1.

[40] Stipulation & Order Governing Case Schedule ¶ 1(v) (Dkt. #41). At a recent hearing, counsel for defendants suggested that the trial date may need to be moved back because of delays in discovery, but that rescheduling has not yet occurred.

[41] *See Postorivo*, 2008 WL 3876199, at *24 (Del. Ch. Aug. 20, 2008) ("[D]epriving Defendants of their chosen counsel, especially in a case like this one with large numbers

On the other side of the ledger, MNAT has taken numerous, and in my view, effective, precautions to protect Duff & Phelps' confidences. Although MNAT did not create an ethical screen from the outset of this litigation, it implemented one the same day that it learned of the issue from defendants' counsel.[42] MNAT has represented in an affidavit that no attorney who has entered an appearance in this action has ever accessed information from the Duff & Phelps Matter, and the two partners who worked on the Duff & Phelps Matter (for less than eight hours combined) have had no involvement in the present litigation.[43] MNAT also has represented that it will not examine Duff & Phelps in this action.[44] Given these representations, I am comfortable that the fairness of these proceedings has not been prejudiced and that appropriate measures are in place to ensure that they will not be prejudiced in the future.[45]

---

of documents, extensive electronic discovery, and numerous fact witnesses, would cause substantial prejudice.").

[42] Hurd Aff. ¶ 2. *See also Express Scripts*, 2007 WL 417193, at *2 (denying defendants' motion to disqualify a law firm even though an ethical screen was implemented only after conflict of interest concerns were raised).

[43] Hurd Aff. ¶¶ 7-9. As noted above, the associate attorney who worked on the matter was no longer with MNAT when this action was filed.

[44] Hurd Aff. Ex. E.

[45] *See Rohm*, 2009 WL 445609, at *3 ("While [defendant] is correct that the ethical rules impute knowledge of one attorney to other attorneys in the firm, the issue before the Court is not whether there was a violation of the ethical rules. To justify disqualification, the

Based on these findings, there is no need for me to determine whether MNAT has violated Rule 1.9(a), an issue on which MNAT and the movants vigorously disagree, with each of them submitting expert opinions in support of their respective positions on the issue. Indeed, given these findings, it would be inadvisable for the Court to opine on the issue since, under prevailing Supreme Court authority, a trial court does not have the independent authority to enforce disciplinary rules governing attorney conduct when the challenged conduct does not prejudice the fairness of the proceedings.

## III. Conclusion

For the reasons explained above, the motion to disqualify is denied.

**IT IS SO ORDERED.**

Sincerely,

*/s/ Andre G. Bouchard*

Chancellor

AGB/gm

---

Court must find that allowing the representation to continue would threaten the fair and efficient administration of justice, a threat that is greatly reduced by a credible representation to the Court that the firm will ensure that the attorneys working on this matter do not have access to [defendants'] client confidences.").