In re **PRESIDENTS MORTGAGE INDUSTRIAL BANK, a Colorado industrial bank, Debtor.**

**PRESIDENTS MORTGAGE INDUSTRIAL BANK, a Colorado industrial bank, Plaintiff–Appellant,**

v.

**INDUSTRIAL BANK SAVINGS GUARANTY CORPORATION OF COLORADO, Defendant–Appellee.**

Civ. A. No. 89–M–609.
Bankruptcy No. 87 B 13155 E.
Adv. No. 88 C 809.

United States District Court,
D. Colorado.

Dec. 13, 1989.

Glen E. Keller, Jr., David R. Garfield, Denver, Colo., for debtor/plaintiff-appellant.

Robert E. Markel, Edward P. O'Brien, Hellerstein, Hellerstein and Shore, P.C., Denver, Colo., for defendant-appellee.

## MEMORANDUM OPINION AND ORDER

MATSCH, District Judge.

This is a bankruptcy appeal. Oral argument will not aid this court's determination. The plaintiff-appellant and debtor, Presidents Mortgage Industrial Bank (Presidents), became insolvent in September, 1987. According to the owner and current president of Presidents, Ronald Weiszmann,

> the industrial bank operated as a mortgage banker. It would take deposits from the public. It would use those funds to make VA, FHA and conventional loans to individuals. Then it would take the FHA and VA loans, either sell them directly into the secondary market or convert them into Ginnie Mae securities.

Record, V. II (Transcript of March 14, 1989 trial) (hereinafter, "Trial Tr."), at 27.

On September 21, 1987, the Colorado Banking Commissioner took possession of the bank and appointed the defendant-appellee, the Industrial Bank Savings Guaranty Corporation of Colorado (IBSGC), as manager of Presidents. On September 22, 1987, the IBSGC opened a bank account for Presidents at the Colorado National Bank of Golden. Several checks for previously approved, federally insured mortgages were outstanding on Presidents' account at the First Interstate Bank of Golden. Robert Kominski, a member of the board of the IBSGC, was designated to run Presidents.

Kominski thought it would be profitable for Presidents to fund some of the outstanding mortgages, and immediately sell them. Presidents' pre-insolvency line of credit at the First Interstate Bank of Golden was apparently unavailable. Accordingly, Kominski and his superior at the IBSGC, Fred Sherman, discussed the possibility of the IBSGC lending Presidents $150,000, enough to fund the loans. The loans would be immediately resold in the secondary market, and from the proceeds of the sale, the IBSGC would be paid back. The loan would be outstanding for a very short period. Presidents would make a several thousand dollar profit based on the difference between the cash advanced on the mortgages, and the price received upon their sale.

On September 24, 1987, the IBSGC transferred $150,000 to Presidents' account at Colorado National Bank. The loans were funded and sold. On September 30, 1987 and October 1, 1987 wire transfers were received at Presidents' Colorado National Bank account representing the proceeds of the loans sold on the secondary market. On October 2, 1987, the IBSGC received $150,000 from Presidents in repayment of the loan.

Presidents filed a petition under Chapter 11 of the Bankruptcy Code on November 2, 1987. On September 20, 1988, Presidents, by then back in the hands of its board of directors, filed a complaint as debtor-in-possession seeking to recover the $150,000 loan repayment from the IBSGC. Presidents claimed that the payment was an avoidable preference. 11 U.S.C. § 547(b)

> provides that a trustee may avoid the transfer of a debtor's interest in property: (1) to a creditor; (2) for an antecedent debt; (3) made while the debtor was insolvent; (4) within ninety days of the filing of a petition for relief in bankruptcy; (5) that enables the creditor to

receive more than the creditor would receive if the transfer had not been made and the debtor's estate were liquidated under Chapter 7 of the Bankruptcy Code. *Porter v. Yukon Nat. Bank*, 866 F.2d 355, 356 (10th Cir.1989).

A trial on the complaint was held before United States Bankruptcy Judge William Hill on March 14, 1989.[1] A Memorandum and Order ("Order") was issued on March 21, 1989. The judge found that Presidents had made a $3,000 profit on the transaction. The judge concluded that a constructive trust existed. Therefore, the judge concluded that the fifth preference element, that the creditor received more than it would have if the transfer had not been made and the case were under Chapter 7, was not satisfied. Said the judge:

> The Guaranty Corporation's intent, as manifested by its board of directors, and Presidents' intent, as manifested by Sherman and Kominski who were in control of Presidents, was that the Guaranty Corporation would loan Presidents $150,000 for a very short duration to allow it to complete loans that were already in process. Both parties intended that the Guaranty Corporation would be immediately repaid out of the proceeds when the completed loans were resold on the secondary loan market. In light of these considerations the court concludes that if Presidents had not returned the $150,000 to the Guaranty Corporation it would have constituted wrongful conduct and an abuse of a confidential relationship warranting the imposition of a constructive trust.

Order at 9. The judge also concluded that "[h]aving Guaranty Corporation officers actually managing Presidents' business created an interrelationship in which the Guaranty Corporation justifiably believed that Presidents would act in the Guaranty Corporation's best interest." Order at 8. Accordingly, Presidents' complaint was dismissed.

Presidents appealed the order. "The sole focus of this dispute and appeal," says Presidents

> is whether IBSGC can properly claim that the $150,000 transferred to IBSGC on October 2, 1987, had been held in constructive trust by PMIB for IBSGC. If so, PMIB would have been required to return all $150,000 to IBSGC in a Chapter 7 liquidation rather than use the money for pro rata distribution to all of PMIB's depositors and creditors.

Appellant's Brief, at 5. The primary ground advanced justifying reversal is that "the relationship between PMIB and IBSGC is not one from which a constructive trust should be imposed." Appellant's Brief, at 7.

Under Colorado law, "[w]hen property has been acquired under circumstances in which the holder of legal title may not in good conscience retain his beneficial interest in it, equity imposes a constructive trust and converts the holder into a trustee." *Ralston Oil & Gas Co. v. July Corp.*, 719 P.2d 334, 338 (Colo.App.1985) (citing *Page v. Clark*, 197 Colo. 306, 592 P.2d 792 (1979)). " 'A constructive trust is, then, the remedial device through which preference of self is made subordinate to loyalty to others.' " *Page v. Clark*, 592 P.2d at 798 (quoting *Meinhard v. Salmon*, 249 N.Y. 458, 164 N.E. 545 (1928) (Cardozo, J.)). As an abstract matter, there can be little doubt that if Presidents elected not to return the money lent by the IBSGC, for the sole financial benefit of Presidents and its depositors, creditors and shareholders, that would have been an act contrary to good conscience.

> The court in *Page* explained that when one party holds a position of superiority over another, or when two parties have a "confidential relationship" a transfer of property obtained as a result of an abuse of those relationships may be set aside.... [a] confidential relationship arises when one party has justifiably reposed confidence in another. The confi-

1. Evidence considered by the judge at the trial includes the deposition of Fred Sherman, an IBSGC official, which is Volume III of the Record. The parties agreed that the deposition could be admitted. *See* Trial Tr. at 24–25.

dential relationship may arise from a multitude of circumstances, but the transferor of the property must be justified in his belief that the transferee will act in the interests of the transferor. *Page v. Clark,* 592 P.2d at 798 (citation omitted). *See also Ralston Oil & Gas Co. v. July Corp.,* 719 P.2d 334, 338 (Colo.App. 1985); *Breeden v. Dailey,* 40 Colo.App. 70, 574 P.2d 508, 510 (1977); *Rosales v. AT & T Information Sys. Inc.,* 702 F.Supp. 1489, 1498–99 (D.Colo.1988) (Carrigan, J.); *In re Specialized Installers,* 12 B.R. 546, 553 (Bankr.D.Colo.1981). Presidents argues that only an abuse of a position of superiority can result in imposition of a constructive trust. Reply Brief at 2. *Page* makes clear that this view is without legal basis, and that a constructive trust may result from abuse of either a superior position or a confidential relationship.

A party justifiably expecting the other to respect his interests might fail to take normal business precautions, such as demanding a security agreement and promissory note before making a loan. Thus, in *United Fire & Cas. Co. v. Nissan Motor Corp.,* 164 Colo. 42, 433 P.2d 769, 771 (1967), the court concluded that essential to a constructive trust was some "prior business agency, ... professional or confidential relationship, [or] family ties ... which might have impelled or induced [the plaintiff] to relax the care and vigilance it would and should have ordinarily exercised in dealing with a stranger." *See also Pioneer Real Estate, Inc. v. Larese,* 762 P.2d 720, 724 (Colo.App.1988).

Presidents argues that the transaction was a commercial loan, and the relationship was nothing more than that of a debtor and creditor. The relationship between a debtor and creditor is not, without more, confidential or fiduciary, so Presidents argues that the judge erred as a matter of law in finding a constructive trust. What Presidents fails to address or understand is that

> [w]hile there is no *per se* fiduciary relationship between a borrower and lender, a fiduciary duty may arise from a business or confidential relationship which induces one party to relax the care and

vigilance it would ordinarily have exercised in dealing with a stranger.

*Rubenstein v. South Denver Nat. Bank,* 762 P.2d 755, 756 (Colo.App.1988) (citing *Dolton v. Capitol Fed. Sav. & Loan Ass'n,* 642 P.2d 21 (Colo.App.1981)). Thus, in *First Commercial Corp. v. First Nat. Bancorporation,* 572 F.Supp. 1430, 1435 (D.Colo.1983) (Arraj, J.), for instance, the court held that under the circumstances, a confidential relationship existed between a debtor and a creditor. Presidents' claim of error must be rejected because the bankruptcy judge analyzed the issue under the correct legal standard. The judge examined the entire circumstances between the parties. He did not rely solely on the fact that a debtor-creditor relationship existed.

Since the bankruptcy judge was not precluded as a matter of law from finding that a confidential relationship existed in spite of the creditor-debtor status of the parties, the question becomes whether the result reached in this case is clearly erroneous. *See* Bankr. R. 8013 ("Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses"); *In re Silver,* 46 B.R. 772, 774 (D.Colo.1985) (Weinshienk, J.). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948).

The finding of the bankruptcy judge that a confidential relationship existed is not clearly erroneous. That finding is based on what the judge found to be IBSGC's justifiable belief that Presidents would act in its best interests with regard to this transaction. Presidents was under the control of the IBSGC. It could act only through the IBSGC. The bankruptcy judge reasonably concluded that the IBSGC justifiably expected the proceeds from the sale of the loan to be paid over by Presidents to the IBSGC. Since the IBSGC was in control of Presidents, in effect the issue

is whether the IBSGC, with regard to this particular transaction, was justified in its belief that its employees and officers would act in the interests of the IBSGC by paying back the loan. Although the decision not to document the loan or take a security interest was foolish in light of the bankruptcy laws, the bankruptcy judge reasonably concluded that the relationship "caused the Guaranty Corporation to feel that it was unnecessary to document the transfer with a promissory note or to take a security interest." Order at 8. The relationship that appears in the evidence is much more than a simple debtor-creditor arrangement.

It is also clear that the IBSGC employees who were running Presidents were acting in the best interests of both entities when they arranged the loan and agreed to pay it back without documentation. No rational third-party lender would have advanced $150,000 to an insolvent industrial bank without security. Thus, making funds available, but only on the condition that they be paid back from the proceeds of the loan sales, benefitted Presidents, to the extent of $3,000. It also benefitted the IBSGC because its public purpose was carried out. An insistence on documentation and arms-length dealing would have resulted in a diminished return to Presidents, or none at all if the transaction costs and interest in a negotiated loan exceeded the $3,000 profit.

Presidents also argues that *State Dep't of Natural Resources v. Benjamin*, 41 Colo.App. 520, 587 P.2d 1207 (1978) mandates that imposition of a trust be denied. *Benjamin* stated that a constructive trust may be denied where it would work an unfair preference over other creditors. 587 P.2d at 1209. However, in *Benjamin*, the plaintiff sought a constructive trust over property in which another creditor had a perfected security interest. *Benjamin* did not establish a flat rule that constructive trusts could not be imposed when other creditors had claims against the putative trustee, it merely underscored the fact that a constructive trust is a creature of equity, and should be denied where it would work an injustice. Repayment of the loan here

was unlike a preference. Presidents had two choices: guarantee repayment of the loan from the proceeds of the mortgages, or forego the transaction. As the judge found, "the transaction with the Guaranty Corporation, viewed as a whole, did not diminish the amount available to depositors in a liquidation." Order at 11. On the contrary, it increased the amount available by $3,000. Further, the payment to the IBSGC did not operate to satisfy IBSGC claims unfairly, it only prevented an unjustified usurpation of funds by a bank that is inexplicably ungrateful for the help it received. The judge's conclusion that imposition of a constructive trust would be equitable in this case is plainly correct.

Presidents' final claim of error is that if there was a confidential relationship, it was not abused. Presidents correctly points out that there is no evidence that it ever did anything unscrupulous with regard to the IBSGC before the bank was returned to its board. However, Presidents' argument misses the point that for a preference to exist, § 547(b)(5) must be satisfied. That section provides that an element of a preference is that the transfer

> enables such creditor to receive more than such creditor would receive if—
>
> (A) the case were a case under chapter 7 of this title;
>
> (B) the transfer had not been made; and
>
> (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

Thus, in deciding whether a preference exists, the court must examine a hypothetical situation where a Chapter 7 proceeding is initiated, and the debt has not been paid. In that hypothetical situation, there would have been an abuse of the confidential relationship.

> If the existence of the confidential relationship has been established, the transaction may be set aside if that relationship has been abused. It is not necessary that the abuse of the confidential relationship be the procuring cause of the original conveyance. The refusal to reconvey is itself a sufficient abuse of

confidence to allow the conveyance to be set aside.

*Page v. Clark*, 197 Colo. 306, 592 P.2d 792, 798 (1979) (citations omitted). Accordingly, under the circumstances posited in § 547(b)(5), a constructive trust would have been imposed on the proceeds.

The IBSGC makes several other arguments. The first is that the property was not really the property of Presidents because it was under the control of the IBSGC. They argue that the so-called "earmarking" doctrine should apply, relying primarily on *In re Bohlen*, 859 F.2d 561 (8th Cir.1988). This argument is foreclosed by the stipulation in the Pre–Trial Statement that "Funds deposited in the Colorado National Bank account belonged to PMIB." Pre–Trial Statement, at 3, par. 6. That is also what the evidence showed at trial. *See* Record, V. III (Deposition of Fred Sherman, February 23, 1989) at 31; Trial Tr. at 64 (testimony of R. Kominski).

The IBSGC also claims that the transaction represented a contemporaneous exchange for new value under 11 U.S.C. § 547(c)(1). That section provides that a transfer cannot be avoided

> to the extent that such transfer was—
> (A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and
> (B) in fact a substantially contemporaneous exchange

However, it appears that the transaction was not intended to be a contemporaneous exchange. Rather, Presidents was to sell the loans, receive the proceeds and pay them over to the IBSGC at some point in the future, albeit in the near future. There is no evidence that IBSGC was intended to receive anything, such as title to the mortgages, at the time it made the payment, or that it was intended to transfer anything at the time it received the loan repayment. *See* Trial Tr. at 65 (Kominski testimony that IBSGC gave Presidents nothing when Presidents paid back the loan). Accordingly, this exception is unavailable. *See, e.g., In re Robinson Bros. Drilling, Inc.*, 877

F.2d 32, 33 n. 1 (10th Cir.1989) (per curiam); *In re Balducci Oil Co.*, 33 B.R. 843, 846 (Bankr.D.Colo.1983).

The IBSGC also argues that the exception in 11 U.S.C. § 547(c)(2) applies, which provides that a transfer is not avoidable

> to the extent that such transfer was—
> (A) in payment of a debt incurred in the ordinary course of the business or financial affairs of the debtor and the transferee;
> (B) made in the ordinary course of the business or financial affairs of the debtor and the transferee; and
> (C) made according to ordinary business terms

*See generally Fidelity Sav. & Inv. Co. v. New Hope Baptist*, 880 F.2d 1172, 1174–78 (10th Cir.1989) (per curiam). While based on the analysis of the constructive trust argument it is probably not necessary to decide this issue definitively, this exception is available.

The debt was incurred in the ordinary course of business of Presidents and the IBSGC. Although Presidents was insolvent, the notion of a preference is applicable only when the debtor is insolvent, so the fact that it was in a precarious financial position cannot in itself render this exception inapplicable. Before insolvency, Presidents was in the business of making and selling mortgage loans, in part with borrowed funds. After insolvency, Presidents was in the business of doing whatever it could to maximize the return to its depositors, creditors and shareholders. Achieving risk-free profits by honoring prior contracts with someone else's money is in the ordinary course of business for a solvent or an insolvent bank.

The IBSGC was in the "business" of doing what it could to protect and help industrial banks. There was testimony that the IBSGC had made this type of loan before. Record, V. III, at 23–24. However frequent or infrequent such loans were, it cannot be said that making a loan to aid an industrial bank is an extraordinary activity of an entity designed to aid industrial banks, regardless of how often it was done.

**514**

The transfer was also made in the ordinary course of business of Presidents and the IBSGC. There was nothing unusual or odd about the way the transfer was made. It was made as agreed between the parties. Finally, the transfer was made according to ordinary business terms, by a timely-delivered check.

Finally, nothing in this transaction suggests that this transfer violates the policy behind § 547.

> The purpose of the ordinary course of business exception is to ensure that normal commercial transactions are not caught in the net of the trustee's avoidance powers.... The obvious extra-"ordinary" transaction is one designed to give the transferee an advantage over other creditors in bankruptcy.

*In re Colonial Discount Corp.*, 807 F.2d 594, 600 (7th Cir.1986) (citation omitted), *cert. denied*, 481 U.S. 1029, 107 S.Ct. 1954, 95 L.Ed.2d 526 (1987). This transaction, by contrast, gave financial benefit only to Presidents and its constituents.

Upon the foregoing, it is

ORDERED that the March 21, 1989 order dismissing the complaint of Presidents Mortgage Industrial Bank against the Industrial Bank Savings Guaranty Corporation is AFFIRMED.