In re MINISCRIBE CORPORATION, a Delaware Corporation, Debtor.

MINISCRIBE CORPORATION, Plaintiff,

v.

KEYMARC, INC., d.b.a. Tokyo Circuits, Ltd., Defendant.

Adv. No. 90 1190 PAC.
Bankruptcy No. 90 B 00001 E.

United States Bankruptcy Court, D. Colorado.

Jan. 11, 1991.

William A. Bianco, Madison E. Bond, Denver, Colo., for plaintiff.

John Mason, Jr., Santa Monica, Cal., Albert T. Funada, Torrance, Cal., Richard Romero, Los Angeles, Cal., for defendant.

## MEMORANDUM OPINION AND ORDER

PATRICIA A. CLARK, Bankruptcy Judge.

This matter is before the Court upon the debtor-in-possession's, Miniscribe Corporation's (Miniscribe), complaint to recover alleged preferential transfers to Keymarc, Inc., (Keymarc).

The relevant facts are as follows. Miniscribe was a corporation whose primary business involved the design, manufacture and sale of computer disk drives, to provide mass data storage for computer use. One of Miniscribe's most promising products for the future involved the development of a one-inch hard disk drive. In order to produce the one-inch hard disk drive, expensive and specialized tooling equipment needed to be built to manufacture three key parts—aluminum base plates, actuators and top covers. Miniscribe contracted with Keymarc to manufacture the equipment and provided the financing for it. Keymarc in turn gave the specifications for the tooling equipment to Kenseisha, a Japanese company with ties to Keymarc. Kenseisha manufactured the tooling equipment which produced the three integral parts for Miniscribe's one-inch disk drives. Kenseisha then sold the parts to Tokyo Circuits, a Japanese export company of Keymarc, which then transferred the components to Keymarc. The caption of this adversary proceeding is phrased "Keymarc, Inc., d.b.a. Tokyo Circuits, Ltd." which reflects the close interrelationship of the two entities. After Keymarc paid Kenseisha for the goods and delivered them to Miniscribe, Keymarc would send invoices to Miniscribe with payment terms of "net 30," which meant payment for the goods was due within 30 days of the invoice being sent.

This business arrangement lasted from late 1988 up until January 1, 1990, when Miniscribe filed its Chapter 11 voluntary petition. Between October 3, 1989 and the petition date, Miniscribe made several payments to Keymarc for the components purchased as reflected in the outstanding invoices sent to Miniscribe. Each payment was received by Keymarc within 90 days of the petition date. Since the filing of the Chapter 11, most of Miniscribe's assets have been purchased by a company called "Maxtor," and Keymarc still does business with that entity, supplying the parts for the one-inch disk drive products. Miniscribe still exists as a debtor-in-possession.

This action has been brought under 11 U.S.C. § 547 by Miniscribe, alleging that the payments made to Keymarc within 90 days of the filing of the petition represent preferential payments which should be recovered for the benefit of the estate. Where a debtor acts as a debtor-in-possession in a Chapter 11 case, the debtor-in-possession has the power of a Chapter 11 trustee to pursue a cause of action under 11 U.S.C. § 547. *In re Electronic Metal Products*, 916 F.2d 1502 (10th Cir.1990); *In re Brent Explorations*, 31 B.R. 745 (Bankr.D.Colo.1983); *See* 11 U.S.C. § 1107(a). The following comprises a list of the relevant transactions:

| Keymarc Invoice No. | Invoice and Shipment Date | Payment Due Date | Date of Receipt | Amount Paid | Preference Payment | Total |
|---|---|---|---|---|---|---|
| 8218910 | 08 18 89 | 09 17 89 | 10 04 89 | $ 3,816.00 | Payment 1 | |
| 8218909 | 08 21 89 | 09 20 89 | 10 04 89 | 1,820.00 | Payment 1 | $ 5,636.00 |
| 8218905 | 08 21 89 | 02 20 89 | 10 10 89 | 1,870.00 | Payment 2 | 1,870.00 |
| 20986 | 09 04 89 | 10 04 89 | 10 23 89 | 57,000.00 | Payment 3 | 57,000.00 |
| 21110 | 10 23 89 | 11 22 89 | 12 01 89 | 2,160.00 | Payment 4 | |
| 21111 | 10 23 89 | 11 22 89 | 12 01 89 | 611.60 | Payment 4 | |
| 21116 | 10 26 89 | 11 25 89 | 12 01 89 | 2,160.00 | Payment 4 | |
| 21115 | 10 26 89 | 11 25 89 | 12 01 89 | 1,584.00 | Payment 4 | |
| 21117 | 10 26 89 | 11 25 89 | 12 01 89 | 1,465.20 | Payment 4 | |
| 21122 | 10 30 89 | 11 29 89 | 12 01 89 | 4,304.00 | Payment 4 | |
| 21121 | 10 30 89 | 11 29 89 | 12 01 89 | 958.00 | Payment 4 | |
| 21123 | 10 30 89 | 11 29 89 | 12 01 89 | 730.40 | Payment 4 | 13,973.20 |
| 21142 | 11 08 89 | 12 08 89 | 12 18 89 | 2,600.00 | Payment 5 | |
| 21154 | 11 13 89 | 12 13 89 | 12 18 89 | 4,000.00 | Payment 5 | |
| 21169 | 11 15 89 | 12 15 89 | 12 18 89 | 1,920.00 | Payment 5 | |
| 21179 | 11 20 89 | 12 20 89 | 12 18 89 | 4,704.00 | Payment 5 | |
| 21180 | 11 21 89 | 12 21 89 | 12 18 89 | 4,000.00 | Payment 5 | 17,224.00 |

Although there are 17 different invoices, there are only five preference payments, because certain of the invoices were combined and payments were made on five dates with five checks.

There are numerous issues which confront the Court. First, are the payments referenced above avoidable as preferential transfers as defined by 11 U.S.C. § 547(b). Secondly, if the first question is answered affirmatively, are there defenses available to Keymarc under 11 U.S.C. § 547(c) which would act to deny Miniscribe the right to avoid the preferential payments. Keymarc asserts that even if the elements of a preferential transfer are proven under 11 U.S.C. § 547(b), the payments cannot be avoided because they were contemporaneous exchanges as defined by 11 U.S.C. § 547(c)(1), and were incurred in the ordinary course of business pursuant to 11 U.S.C. § 547(c)(2).

As grounds for Miniscribe's position that the payments were preferential, Miniscribe presented evidence at the hearing concerning the way business was conducted during the preference period. Miniscribe asserts that during that time, payments were made to various creditors based upon each creditor's "threshold of pain," because Miniscribe could not meet the regular payment terms imposed by their creditors as a result of financial problems and restricted cash flow. The testimony of Mr. Michael Kepler, the Miniscribe manager responsible for vendor relations with Keymarc and other creditors, revealed that the amount of money available each week to pay creditors was always less than what was needed. As a result, he was forced to stretch payments on invoices up to Keymarc's (and other creditors') "threshold of pain," a term which describes when a creditor would complain of late payment and threaten to either ship the goods C.O.D. or terminate its relationship with Miniscribe.[1]

Although Mr. Kepler testified that he did not receive direct threats from Keymarc regarding cessation of shipments, he did acknowledge Keymarc applied indirect pressure on Miniscribe to receive prompt payment within the 90 days prior to the filing of the petition. This fact was evidenced by plaintiff's Exhibit J, which is a faxed letter from a Mr. Michio Shiba, a Miniscribe employee located in Tokyo. Exhibit J states in part "Keymarc suggested Kenseisha to stop next shipping because they could not receive payments schedule

1. It is important to note that Mr. Kepler now works for Maxtor, which continues to do business with Keymarc. Therefore, Mr. Kepler had to "tread lightly" on the witness stand, so as not to make any statements which could damage that business relationship.

from Miniscribe re 8 invoices attached which due dates are Nov 22." Mr. Kepler stated that the one-inch disk drive was a very important product of Miniscribe, and the future of the company was hinged upon its success.

Miniscribe further asserts that its slide into bankruptcy was well publicized, as shown by plaintiff's Exhibit N, which is a September 11, 1989 copy of a front page article published in *The Wall Street Journal*, entitled "Cooking the Books, How Pressure To Raise Sales Led Miniscribe To Falsify Numbers." Miniscribe contends that Keymarc executives read the article, became concerned over Miniscribe's financial abilities, and engaged in unusual debt collection practices as a result. Miniscribe believes Keymarc used its leverage as the sole supplier of critical parts to extract payments from Miniscribe that otherwise might not have been made. Testimony was elicited from Mr. Yoshi Terajima, President of Keymarc, and overseer of the payments from Miniscribe, who stated he read *The Wall Street Journal* article and became more cautious with the status of the Miniscribe account afterwards. He also testified that he knew Miniscribe was a troubled company, was aware of the importance of the goods Keymarc shipped to Miniscribe, and that if Keymarc halted its shipments, there would be a disruption in Miniscribe's business because the specialized tooling equipment in Kenseisha's possession would have to be transferred to a new supplier.

Mr. Terajima candidly admitted that it was his desire to have Miniscribe speed up payments to Keymarc, so as to reduce Keymarc's exposure. Although he did not directly speak to Miniscribe about this, he testified that the message was communicated to them in some way. Mr. Terajima stated that he did not recall making any threats to Miniscribe regarding the stopping of shipments. On cross-examination, Mr. Terajima testified that Miniscribe was an important customer. He further stated that although most customers were on a "net 30" basis, very few paid within

the 30-day period. However, the payment terms with Miniscribe on the "net 30" basis were never changed.

Miniscribe also had Ms. Heather Godette testify, who was a Miniscribe employee responsible for the payment of invoices tendered by Keymarc. Ms. Godette stated that from June of 1989 through December of 1989, she was contacted four times by Keymarc representatives, who inquired about the status of payments. Prior to that time period, she never had any contact with Keymarc personnel. Ms. Godette stated that the conversations with Keymarc representatives were polite, and not hostile or demanding. Although she was aware that there was a pecking order as to which creditors got paid first, she did not believe Keymarc was paid any differently during the preference period than prior to the preference period.[2]

Keymarc, on the other hand, asserts that the payments involved were not preferences. They state the payments were not made on account of an antecedent debt, that Miniscribe was not insolvent when the transfers occurred, and that the payments did not enable Keymarc to receive more than they would have received if the case had been filed under Chapter 7. Further, Keymarc raises two defenses to the attempts to avoid the alleged preferential transfers. They state that under 11 U.S.C. § 547(c)(1), the payments were in fact contemporaneous exchanges and did not deplete the estate. Additionally, the "net 30" payment terms were an expression of a pay-as-you-go relationship, not a credit relationship. Keymarc also argues that under Section 547(c)(2), the payments complained of were made in the ordinary course of business. They assert that merely because Miniscribe's payments were often late does not negate the fact that the payments were ordinary. They state the irregular late payments constituted Miniscribe's ordinary course of business, and that the payments received by Keymarc within the preference period were not made

---

2. Ms. Godette also works for Maxtor and, like Mr. Kepler, was careful not to offend Mr. Teraji-ma or Keymarc, a current supplier of necessary goods.

in any different manner than previous payments they had received from Miniscribe.

The resolution of whether the payments involved constitute an avoidable preference necessitates a review of 11 U.S.C. § 547(b) which states:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

■ In order to constitute an avoidable preference, all five elements set forth in 11 U.S.C. § 547(b) must be satisfied. *In re George Rodman*, 792 F.2d 125 (10th Cir. 1986); *In re Alpex Computer Corp.*, 60 B.R. 315 (Bankr.D.Colo.1986); *In re Balducci Oil Company, Inc.*, 33 B.R. 843 (Bankr.D.Colo.1983). The purpose of the preference statute is to discourage creditors from engaging in unusual collection practices which help dismember the debtor and hasten its slide into bankruptcy. Secondly, the statute facilitates the goal of equal distribution among creditors of the debtor. S.Rep. No. 95–989, 95th Cong., 2d Sess. 88 (1978); H.R.Rep. No. 95–595, 95th Cong., 1st Sess. p. 373 (1977), U.S.Code Cong. & Admin.News 1978, 5787. *See also*

*Begier v. IRS,* ——— U.S. ———, 110 S.Ct. 2258, 110 L.Ed.2d 46 (1990).

The first element of the test is easily satisfied. There is no question that Keymarc was a creditor of Miniscribe when Miniscribe transferred the payments to Keymarc. The two entities had an ongoing business relationship, whereby Miniscribe would send orders to Keymarc. Keymarc forwarded the orders to a company called Tokyo Circuits, Limited, which was a d.b.a. of Keymarc and was the exporter of the parts. Tokyo Circuits in turn sent the orders to Kenseisha, the actual manufacturer of the computer parts. Once manufactured, the goods went back down the line, to Tokyo Circuits, Keymarc and then to the debtor. Keymarc would send invoices billing Miniscribe for the parts.

■ The second element of Section 547(b) is that the payments be for or on account of an antecedent debt. The Code defines debt as liability on a claim. 11 U.S.C. § 101(11). While the Bankruptcy Code fails to define the term "antecedent debt," a debt is antecedent if it is incurred before the transfer. *See In re Wey,* 78 B.R. 892 (Bankr.C.D.Ill.1987), *aff'd,* 854 F.2d 196 (7th Cir.1988); *In re Western World Funding, Inc.,* 54 B.R. 470, 476 (Bankr.D.Nev.1985); *see also* 4 *Collier on Bankruptcy,* ¶ 547.05 (15th ed. 1990). Again, the Code fails to reveal when a debt is incurred. However, the Tenth Circuit decided in *In re White River Corp.,* 799 F.2d 631, 632 (10th Cir.1986) "that a debt is incurred when a debtor first becomes legally obligated to pay".... Here, Miniscribe became legally obligated to pay when Keymarc shipped the computer components to Miniscribe. When that happened, Miniscribe obtained a property interest in the goods that gave rise to the debts. In *Matter of Richter and Phillips Jewelers and Distributors, Inc.,* 31 B.R. 512, 515 (Bankr. S.D.Ohio 1983), the Ohio bankruptcy court determined "it is equally well established that [a] property interest arises when the goods are delivered, shipped or identified to the contract, *not* at the time payment is due or the invoice is sent" (emphasis in original). Thus, although Miniscribe's pay-

ment terms were "net 30," their obligation to pay arose upon the shipment date. As the chart previously set out indicates, in each case the shipment dates occurred well before there was a transfer of funds. Consequently, the payments were on account of antecedent debts.

■ The third element of Section 547(b) to be satisfied is that the transfer occurred while the debtor was insolvent. This is determined by comparing the debtor's assets and liabilities on a balance sheet test.[3] At the hearing, the written direct testimony of Mr. William Weiskopf, a partner in the accounting firm of Ernst & Young, was admitted into evidence by stipulation of the parties. The testimony reveals that after a review of Miniscribe's Annual Reports for the fiscal years which ended on January 1, 1989 and December 31, 1989, Miniscribe's balance sheet reflected that on July 2, 1989, Miniscribe's liabilities exceeded its assets by $137 million. By December 31, 1989, that liability figure grew to $218 million. The last paragraph of that admitted testimony states "based upon my investigation, it is my opinion that Miniscribe was insolvent at July 2, 1989, December 31, 1989, and for the six-month period inclusive of those dates." (Paragraph 7, plaintiff's Exhibit A). There is a presumption under 11 U.S.C. § 547(f)[4] that for the 90 days immediately preceding the bankruptcy filing, the debtor is insolvent. The presumption of insolvency is rebuttable by a defendant upon the presentation of reasonable evidence to the contrary. Keymarc did not offer any evidence either at the hearing or in its brief that Miniscribe was solvent, although they did assert that Miniscribe was in fact solvent at the time the transfers were made. Such bald assertions, unsupported by testimony or evidence, do not in any way act to rebut the presumption of

insolvency contained in Section 547(f), and do not compel the debtor-in-possession to present any further evidence on the subject. The third element has been satisfied. *See, In re Balducci Oil Company, Inc., supra.*

■ There is no question that the transfers occurred within 90 days before the date of the filing of the petition, which is the fourth element under Section 547(b). For purposes of determining on which date a transfer occurs, payment occurs upon the delivery of a check. *See In re White River Corp., supra.* The payments complained of in this case were all received by Keymarc after October 3, 1990, and within the 90-day preference period.

The final Section 547(b) element mandates that the payments received by the transfer enable the creditor to receive more than they would have received had the transfer not occurred and the debtor's estate been liquidated under Chapter 7. As previously stated, the debtor's liabilities exceeded its assets by $218 million at the time of the filing of the petition. No evidence was tendered to the Court which would indicate that Keymarc was a secured creditor of Miniscribe's. In deciding whether a preference exists under Section 547(b)(5) "the court must examine a hypothetical situation where a chapter 7 proceeding is initiated, and the debt has not been paid." *In re Presidents Mortgage Industrial Bank,* 110 B.R. 508, 512 (D.Colo.1989). In such a situation, Keymarc would have been an unsecured creditor and would have received far less than the $95,703.20 it received as a result of the payments made. It also appears that because of Miniscribe's $218 million in excess liabilities, that other creditors within the same class of general unsecured creditors

---

**3.** Insolvency is defined by 11 U.S.C. § 101(31) which states in relevant part:

    (A) with reference to an entity other than a partnership, *and a municipality,* financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of—

    (i) property transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors; and

    (ii) property that may be exempted from property of the estate under section 522 of this title; . . . .

**4.** 547(f) states:

    (f) for the purposes of this section, the debtor is presumed to have been insolvent on and during the 90 days immediately preceding the date of the filing of the petition.

as Keymarc would not have received anywhere near the same percentage payment on their debts as that received by the defendant. It is likely that if a Chapter 7 had occurred, unsecured creditors would not have received any distribution from the estate. Keymarc received much more than other similarly situated creditors and therefore payments made to them by the debtor did in fact diminish the estate. *See In re Brent Explorations, supra.*

Keymarc makes the argument that a $30,000 check was dishonored within the 90–day preference period, thereby enhancing the estate because Miniscribe received the benefit of the goods without paying for them. Keymarc's argument is without merit. The relevant inquiry under Section 547(b)(5) focuses upon whether the creditor has received disparate favorable treatment as a result of the payment received from the debtor within the preference period. Whether Keymarc has a separate claim against the estate on the dishonored check is irrelevant for purposes of analysis under Section 547.[5]

The necessary elements under Section 547(b) to prove the transfers were all preferential have been satisfied. In order to avoid having to return the money to Miniscribe, Keymarc must successfully show to the Court that it has an applicable defense under 11 U.S.C. § 547(c). Keymarc has asserted two such defenses.

■ Keymarc argues that the transfers made should not be avoided because they were intended by the parties to be, and actually were, contemporaneous exchanges with new value given to the debtor upon each exchange. If true, 11 U.S.C. § 547(c)(1) would forbid Miniscribe from avoiding such an exchange.[6] The term "new value" is defined in Section 547(a)(2) as meaning

[M]oney or money's worth in goods, services, or new credit, for release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law, including proceeds of such property, but does not include an obligation substituted for an existing obligation;
. . . .

In *In re Robinson Brothers Drilling, Inc.*, 877 F.2d 32, 34 (10th Cir.1989), the Tenth Circuit stated that "the term 'new value' implies that the creditor must prove that [sic] the specific valuation in 'money or money's worth in goods, services, or new credit'". Citing *In re Jet Florida Systems, Inc.*, 861 F.2d 1555 (11th Cir.1988). The Tenth Circuit further stated that any other decision would mean "nearly any transfer for or on account of an antecedent debt would be insulated from recovery as a preference under Section 547(c)(1)" *supra* at 34.

Keymarc contends that its transactions with Miniscribe were not intended to be credit transactions, and that the "net 30" terms of payment expressed that philosophy. However, on only three of 115 occasions did Miniscribe pay on time in the year prior to the filing of this case. Some invoices in the preference period were not paid until 50 days after the components had been shipped to Miniscribe, while in the year prior to filing, one invoice was not paid until 110 days after the goods were shipped. Most of the debts were incurred by Miniscribe long before the payments were sent, and well after Keymarc had rendered its services on each particular invoice. These circumstances "disclose[ ] overdue payment for an antecedent debt, not new value" *In re Alpex Computer Corp., supra,* at 319. *See also In re West-*

---

5. Keymarc did not raise a defense under 11 U.S.C. § 547(c)(4) asserting that goods forwarded to the debtor after Keymarc received the $30,000 constituted new value for purposes of 11 U.S.C. § 547(c)(4). *See In re Meredith Manor, Inc.,* 902 F.2d 257 (4th Cir.1990). Therefore, the Court will not consider the issue.

6. 11 U.S.C. § 547(c)(1) states:

(c) The trustee may not avoid under this section a transfer—
(1) to the extent that such transfer was
(A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and
(B) in fact a substantially contemporaneous exchange; . . . .

*ern World Funding, Inc., supra,* at 760. The fact that Keymarc "may have promised to continue doing business with [Miniscribe] if it paid its bills is not new credit or new value to the estate." *In re Robinson Brothers Drilling Co., Inc., supra,* at 34. In *Matter of Richter & Phillips Jewelers Distributors, Inc., supra* at 515, the court found that "the transfer of funds was on account of an antecedent debt, *since the 'net 90' terms of payment constitute a credit transaction, not a contemporaneous transfer.*" (emphasis added)

Keymarc also asserts that Miniscribe should not be entitled to avoid the transfers because pursuant to 11 U.S.C. § 547(c)(2), the transfers were for the payment of debts incurred in the ordinary course of business, and the payments were made in the ordinary course of business and pursuant to ordinary business terms. 11 U.S.C. § 547(c)(2) provides that the trustee cannot avoid a transfer:

> (2) to the extent that such transfer was—
>
> (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;
>
> (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and
>
> (C) made according to ordinary business terms; ....

In order to successfully raise a defense under Section 547(c)(2), all three elements under the statute must be satisfied. *Fidelity Savings and Investment Co. v. New Hope Baptist,* 880 F.2d 1172 (10th Cir. 1989).

The intent of this Code section is to protect "recurring, customary credit transactions that are incurred or paid in the ordinary course of business of the debtor and the debtor's transferee." 4 *Collier on Bankruptcy,* ¶ 547.10 (15th ed. 1990). It was not intended to "protect payments resulting from 'unusual' debt collection practices." *In re Bob Grissett Golf Shoppes, Inc.,* 78 B.R. 787, 790 (Bankr.E.D.Va.1987). *See also In re Craig Oil Company,* 785 F.2d 1563 (11th Cir.1986).

Keymarc maintains that the payments Miniscribe made to them during the preference period did not differ in any way from payments made previous to the preference period. Keymarc contends that they did not engage in any unusual debt collection methods to obtain the payments, and that the transactions were in the ordinary course of business because the parties stipulated that Miniscribe was engaged in the manufacturing of hard disk drives, and paid Keymarc for parts used in those disk drives. Keymarc further states that the late payments made by Miniscribe constituted Miniscribe's ordinary way of doing business and that "net 30" was an ordinary course of business term.

It is Miniscribe's position that while the debts might have been incurred in the ordinary course of business, payments made to Keymarc within the 90 days prior to the filing of the petition were anything but ordinary. Miniscribe asserts that because Keymarc was aware of Miniscribe's precarious financial condition, Keymarc used its leverage as a singular supplier of critical parts to insure it received payments on outstanding invoices. Miniscribe submitted a bar graph to the Court which purported to show that during the preference period, the payments made to Keymarc were more timely than had previously been the case. They also elicited testimony from Mr. Kepler that Keymarc was an important supplier, and that it was possible shipping would terminate if Keymarc was not paid. He further testified that there was indirect pressure from Keymarc during the preference period to receive prompt payments, but that he did not favor Keymarc over other creditors, and paid whomever was necessary to keep the business operating.

█ In determining whether the transfers were ordinary, it is necessary for the Court to look at the prior course of conduct which existed in the Keymarc/Miniscribe relationship. In the year prior to the filing, Miniscribe was late on almost every occasion with payments to Keymarc. In fact, prior to the preference period, payments were made on time only once out of 98 times. It is true that the delay in pay-

ments swung wildly, sometimes occurring 110 days after invoices were sent, while at another time being made 28 days after invoices were sent. This payment pattern is consistent with the financial troubles Miniscribe was undergoing. However, prior to the preference period, it does not appear that Miniscribe was ever contacted by Keymarc personnel regarding late payments. During the preference period Miniscribe was contacted three or four times by Keymarc representatives. Additionally, during the preference period, 13 out of 17 payments made were less than 10 days late, and the final two payments were actually made earlier than the "net 30" terms delineated. Those last two payments occurred on the 18th of December, 1989.

■ Keymarc might be correct in asserting that under *In re Yurika Foods Corporation*, 888 F.2d 42 (6th Cir.1989) and *In re Fulghum Construction Corp.*, 872 F.2d 739 (6th Cir.1989), the irregular and late payments by Miniscribe constituted the norm in their business relationship and were thus within the ordinary course of business. However, the fact that payments during the preference period were much more timely, and in two cases complied with the "net 30" terms, indicate that those payments were not ordinary. Many cases have considered whether transfers made in similar circumstances occurred in the ordinary course of business. In *In re Bob Grissett Golf Shoppes, supra,* at 791, the court stated that

> With knowledge of the debtor's deteriorating financial condition, ProGroup threatened to discontinue future shipments unless the antecedent debt was liquidated in full.... This variation from the party's usual course of dealing is significant. By its demand ProGroup attempted to exercise leverage giving it more favorable terms than in the past.

See also *J.P. Fyfe, Inc., of Florida v. Bradco Supply Corp.*, 891 F.2d 66 (3rd Cir.1989).

In *Matter of Seawinds Limited,* 888 F.2d 640 (9th Cir.1989), the Ninth Circuit determined that a creditor who took steps to terminate its contract with a struggling debtor and which used economic pressure to obtain fast payments engaged in conduct which was to the detriment of other creditors could "hardly be considered to be within the ordinary course of business." At 641. While Keymarc did not take steps to terminate its contracts with Miniscribe, the Court finds that the phone calls and the faxed letter of Exhibit J indicates economic pressure was exerted by Keymarc, and unusual debt collection practices occurred. *See In re Craig Oil Company, supra* (wherein the court determined from a review of the legislative history that Section 547(c)(2) should not protect payments which resulted from unusual debt collection practices.) Thus, while the debts might have been incurred in the ordinary course of business, the payments on those debts were not made in the ordinary course of Miniscribe's business and were not made pursuant to the ordinary business terms of the parties.

Keymarc contends that merely because they made phone calls to Miniscribe concerning late payments does not indicate an attempt to apply pressure and extract payments from the debtor. In support of their proposition, they rely on *In re Gardner Matthews Plantation Co.,* 118 B.R. 384 (Bankr.D.S.C.1989), wherein the court found that the creditor's phone calls to the debtor threatening to stop future sales during the preference period were ordinary. However, in the case *sub judice* phone calls were received by Miniscribe from Keymarc *only* during the preference period.[7] In the

---

**7.** The Court received potentially conflicting testimony on this point. In Ms. Godette's prepared written statement of direct testimony admitted into evidence as plaintiff's Exhibit C, it is stated *"Within the last 90 days of 1989,* I was contacted *three* or *four times* by one or more representatives of Keymarc, who inquired as to the status of payments. *I had no contact with Keymarc prior to that time."* (Emphasis added.) Ms.

Godette had the opportunity to review that written direct testimony and make appropriate changes. However, this statement was not deleted. On the witness stand, and contrary to the written direct testimony, Ms. Godette stated that those phone calls were received during a seven month period prior to the filing of the petition. The Court finds the written direct testimony of Ms. Godette to be more credible, as those state-

*Gardner* case, the testimony revealed that phone calls from the creditor occurred on a regular basis, both prior to and during the preference period. Thus, in *Gardner,* the phone calls were deemed ordinary. In this case, the Court believes the phone calls were not ordinary, and are evidence of Keymarc's attempts to apply indirect pressure on Miniscribe to obtain payments.

ORDERED that the payments in question constitute preferential transfers within the meaning of 11 U.S.C. § 547.

FURTHER ORDERED that Keymarc shall return to Miniscribe the $95,703.20 it received as a result of the preferential transfers, plus interest at the statutory rate.

ments were deliberate and subject to her review. While on the witness stand, Ms. Godette may have been affected by the stress of cross-exami-

nation and having her employer and a supplier of key business parts present in the courtroom.