**In re CM HOLDINGS, INC., Camelot Music, Inc., G.M.G. Advertising, Inc. and Grapevine Records and Tapes, Inc., Debtors.**

**Camelot Music, Inc., Plaintiff,**

**v.**

**MHW Advertising and Public Relations, Inc., Defendant.**

**Bankruptcy Nos. 96–1247 through 96–1250 (PJW).**
**Adversary No. 97–9.**

United States Bankruptcy Court, D. Delaware.

Aug. 28, 2000.

S. David Peress, Young, Conaway, Stargatt & Taylor, Wilmington, DE, Howard S. Beltzer, White & Case, New York City, for debtors and debtors in possession.

Thomas Herlihy, III, Herlihy Harker & Kavanaugh, Wilmington, DE, Jonathon M. Yarger, Ellen M. Kramer, Kohrman Jackson & Krantz P.L.L., Cleveland, Ohio, for Independence Bank.

## MEMORANDUM OPINION

PETER J. WALSH, Chief Judge.

Before the Court are (i) Camelot Music, Inc.'s ("Camelot") Motion for Order Approving Certain Payments Outside the Ordinary Course of Business (Doc. # 396 in Case Nos. 96–1247 through 96–1250) pursuant to § 363(b) of the Bankruptcy Code [1] (the "§ 363 Motion") and the objection thereto by MHW Advertising and Public Relations, Inc. ("MHW") and Independence Bank ("Independence"); (ii) Independence's Request for Payment of Administrative Expense (Doc. # 1120 in Case Nos. 96–1247 through 96–1250) and (iii) Camelot's action (the "Adversary Proceeding") (Adv. Proc. A–97–0009) seeking a judgment against MHW and Independence, pursuant to §§ 547(b) and 550(a), that certain prepetition payments made by Camelot to MHW constitute avoidable preferential transfers.[2] For the reasons

---

[1] Unless otherwise indicated, all references to " § ___" are to a section of the Bankruptcy Code, 11 U.S.C. § 101 *et. seq.*

[2] The Adversary Proceeding was originally commenced against MHW. Subsequently the court granted Independence's motion to intervene as a Defendant in the Adversary Proceeding. MHW and Independence are here-

set forth herein, (i) Camelot's § 363 Motion will be denied, (ii) Camelot will be entitled to judgment against MHW in the § 547 action, and (iii) Independence's request for payment of administrative expense will be granted.[3]

## FACTS

Camelot was one of the largest retailers of prerecorded music in the United States, selling prerecorded and blank audio and video tapes, compact discs, and related products. Camelot filed for bankruptcy relief on August 9, 1996 and its Second Amended Joint Chapter 11 Plan of Reorganization was confirmed on December 12, 1997 with an effective date of January 27, 1998.

Prior to May, 1996, Camelot placed "buys" with radio stations, cable television stations, and print media to run Camelot advertising directly through its in-house marketing department. *See* May 1, 1997 Hearing Transcript at 43:14–44:10 (hereinafter "Trans. at ___") (Doc. # 47). Camelot ordinarily paid media invoices within 30 days of receipt, transmitting checks to media vendors by mail after review of the invoices and supporting documentation. *See id.* at 69:3–70:1; 84:8–85:1; 169:20–170:11; 172:9–11. After verification of the invoices, Camelot would typically remit eighty-five (85) percent of the total amount due to the media vendor and retain fifteen (15) percent as an agency commission, according to standard industry practice. *See id.* at 90:17–24. Camelot characterized itself as a "quick payer" of its invoices, typically paying within 30 days of receipt, an atypical practice within the industry.

*See id.* at 84:24–85:1; 141:13–18; 171:11–19.

In May, 1996, Camelot began to experience increasing financial difficulties and, in an effort to reduce its operating expenses, decided to out source its media buying operations, hiring MHW as its advertising agency. *See id.* at 45:21–46:7; 51:9–12. MHW was, at that time, a regional agency, small in size when compared to the typical agencies operating on a national level. *See* Michael Mooney Deposition at 27:2–28:17 (hereinafter "Mooney Dep. at ___"). No written contract was ever entered memorializing the agreement between Camelot and MHW. *See* Trans. at 101:11–15.

Pursuant to discussions at the outset of the business relationship between Camelot and MHW, the parties opted for a payment method by which (i) following MHW's placement of Camelot's ads with specified media vendors, MHW would be billed directly by the media vendors, (ii) MHW would then consolidate those bills and issue an invoice to Camelot, (iii) Camelot would then pay MHW, and (iv) MHW would remit the requisite funds to the media vendors. *See id.* at 53:16–54:4; 161:8–22. The parties agreed that MHW would receive ten (10) percent commission for its media buying efforts and that an additional five (5) percent of all gross media purchases would be set aside in a pool against which MHW would bill Camelot for creative services rendered to Camelot. *See id.* at 91:7–18; 164:10–165:1. MHW billed Camelot on a project by project basis and not according to a set schedule of payments. *See* Carol Kuk Deposition at

---

inafter sometimes collectively referred to as "Defendants"

3. Sometime after the May 1, 1997 hearing was held in this matter and post-trial briefing was completed, Camelot filed a motion (Doc. # 54) seeking to re-open the record to submit

additional factual information for the Court's consideration. The motion was never ruled on, Camelot withdrew the motion to re-open, and the opinion rendered herein is based solely on the record as it existed prior to the motion to reopen.

9:6–7:2 (hereinafter "Kuk Dep. at ___"). MHW's payment terms were "net 30," that is, Camelot had 30 days after receipt of an MHW invoice in which to remit payment in a timely manner. *See* Trans. at 140:21–141:4.

At or about this time, MHW asked Camelot to provide it with certain credit information although MHW did not specify the intended use for the information. *See id.* at 54:9–12; *see also* Laura Popa Deposition at 32:14–33:2 (hereinafter "Popa Dep. at ___"). The requested credit information was provided along with Camelot's billing requirements. *See* Trans. at 56:1–20; *see also* Joint Exhibit 40 (hereinafter "JE ___").

The method by which Camelot and MHW pursued Camelot's advertising needs involved Camelot sending requests to MHW for information about certain media vendors in target markets. *See* Trans. at 57:24–58:2. On occasion, MHW would provide unsolicited recommendations to Camelot about certain media markets, but the primary initiative in identifying markets lay with Camelot. *See id.* at 58:2–6. The requested information was provided to Camelot for approval, rejection, or requests for changes or additional information. *See id.* at 58:7–10.

Camelot apparently allowed little or no discretion to MHW regarding the placement of media buys. *See id.* at 58:11–13. Camelot approved each media placement and MHW was not permitted to alter those placements once approved. *See id.* at 57:18–58:13; *see also* Peter Judy Deposition at 9:1–10:2 (hereinafter "Judy Dep. at ___"); Kuk Dep. at 16:9–18:21. All media vendors were advised that the time or space purchased by MHW was for use by Camelot. *See* Kuk Dep. at 19:4–7. MHW provided Camelot with the address of each media vendor so that Camelot could convey advertising copy or material

for broadcast advertising spots to its chosen media vendor. *See* Trans. at 59:1–12; *see also* Kuk Dep. at 15:8–15. Camelot instructed MHW when to run Camelot's advertisements, in which markets, and on what broadcast stations. *See* Kuk Dep. at 15:13–17.

Camelot tendered payment directly to MHW for its media buying and creative services, with only two exceptions in which Camelot was mistakenly billed directly by vendors, mistakes, that were later corrected. *See* Trans. at 118:2–14; Kuk Dep. at 11:12–12:18. Camelot paid MHW on the invoices submitted, MHW retained its 10% commission on media buys and MHW was deemed entitled to 5% commission on gross sales for creative services provided to Camelot. The remaining 85% was earmarked for payment to the various media vendors. MHW and not Camelot dealt directly with the vendors and all of the vendors' invoices in question are in MHW's name and not Camelot's name. *See* JE 47. Camelot knew that MHW's payables included the cost of placing ads with vendors.

MHW was billed directly by media vendors. *See* JE 47; *see also* Kuk Dep. at 11:8–11. MHW verified the accuracy of these invoices, paid the vendors directly and then billed Camelot for those charges. *See* Kuk Dep. at 8:8–17; *see also* Trans. at 118:15–18. Camelot remitted the payment for the media buys to MHW. All funds were deposited into MHW's lone deposit account along with funds received from other clients. *See* Mooney Dep. at 11:15–12:5. MHW did not segregate the funds in its deposit account. *See* Henry Deitz Deposition at 10:13–21. MHW treated monies owed by Camelot as accounts receivable and listed them as such in its books. *See* Popa Dep. at 16:9–18. Camelot did not list the media vendors as accounts payable on its books. *See* JE 36.

MHW also provided Camelot with limited creative input, creating "frameworks" for some advertisement scripts, although the bulk of the creative and production work on Camelot's advertisements during this period were handled in house at Camelot and through third-party services hired by Camelot. *See* Trans. at 58:18–24.

The first Camelot ad run in time purchased by MHW for Camelot aired on June 6, 1996. *See id.* at 59:16–19. Between that date and August 1, 1996, MHW did not invoice Camelot for any of the media buys it made on Camelot's behalf or for MHW's services. *See id.* at 60:1–4.

On August 2, 1996, Camelot requested that MHW provide full invoices of all media that had been purchased as of that date. *See id.* at 64:16–22. MHW informed Camelot that MHW did not, at that time, have at its disposal all of the underlying invoices and proof of performance documents that Camelot typically required for reviewing its obligations pursuant to media buys. *See id.* at 65:8–66:4. Nevertheless, Camelot requested that the invoices be forwarded with as much of the required information as was then available and instructed MHW to forward the remainder of the standard supporting documentation as soon as it became practicable for MHW. *See id.* at 66:11–20.

On August 2, 1996, Camelot received MHW's invoice dated July 15, 1996 (the "July 15 Invoice"). *See id.* at 67:3–10; 168:10–12; *see also* JE 1. The July 15 Invoice, the first invoice MHW had sent to Camelot since the commencement of their business relationship, was hand delivered to Camelot. *See* Trans. at 67:15–16; JE 1. There were no backup documents accompanying the July 15 Invoice. *See* Trans. at 68:7–12. Upon receipt, Michelle Watkins ("Watkins"), Camelot's Director of Marketing Services, took the July 15 Invoice and presented it by hand to Camelot's Vice President of Finance, Lee Ann Thorn ("Thorn"). *See id.* at 68:13–69:9. Watkins apparently noticed that the July 15 Invoice included only media buys placed in June and did not include every ad that had been run to date. *See id.* at 70:6–11. Watkins then requested an additional invoice that was subsequently faxed to Camelot without any supporting documentation on August 2, 1996 (the "August 2 Invoice"). *See id.* at 70:12–72:5; 173:16–23; *see also* JE 2. Camelot's standard procedure for paying invoices required review and verification of supporting documents during a thirty-day period before payment would be made. *See* Trans. at 69:3–70:1; 169:20–170:11. Apparently, MHW did not, at any time, exert pressure on Camelot to make payments on either the July 15 Invoice or the August 2 Invoice.

On Monday, August 5, 1996 Watkins and Bob Roberts, Camelot's Vice President of Marketing ("Roberts"), attended a meeting with David McCafferty ("McCafferty") and Peter Judy ("Judy") two officers from MHW. *See id.* at 74:6–23. At that meeting, two Camelot company checks signed by Thorn, one in the amount $142,298, the other for $60,996, were hand delivered to MHW in satisfaction of the July 15 Invoice and the August 2 Invoice. *See id.; see also* JE 21 and JE 22. At the August 5, 1996 meeting, Camelot's representatives advised MHW to deposit the checks "quickly." *See* Trans. at 175:15–18. Four days later, Camelot filed for relief under Chapter 11. At no time prior to these transfers did Camelot reveal to MHW that it was considering filing for bankruptcy protection. *See id.* at 166:8–168:12; 201:12–202:17. MHW continued postpetition to provide media buying and related services to Camelot.

On or about August 13, 1996, Watkins discussed with McCafferty and Judy the absence from the July 15 Invoice and Au-

gust 2 Invoice of all costs related to a Sunday newspaper insertion placed by MHW for Camelot in late July, 1996. *See id.* at 76:5–77:15; *see also* JE 65. Several days later, Judy advised Watkins that, of the $130,000 in unpaid amounts due on account of the late-July Sunday insert, MHW was primarily concerned with approximately $30,000 to $40,000 of the total

> because [MHW] felt they were only liable for four newspapers that they had signed contracts with and that they intended to tell the other newspapers to seek payment from Camelot directly.

Trans. at 78:4–16; *see also* Judy Dep. at 12:8–14:12. Subsequently, MHW invoiced Camelot for the amounts due the four newspapers with whom MHW had directly contracted. *See* Trans. at 78:17–23. MHW never invoiced Camelot for the other newspapers that ran the late-July Sunday insert. *See id.* at 78:24–79:2.

Sometime later, MHW raised concerns to Camelot that MHW had heard voiced by some media vendors regarding Camelot's ability to pay its invoices going forward. *See id.* at 79:12–24. In response to the media vendor's concerns, Camelot provided a letter ("the Letter") to MHW for the benefit of Camelot's media vendors. *See id.* at 81:4–10. The Letter, prepared by Camelot's Chief Financial Officer, described Camelot's bankruptcy proceeding and offered assurances to the various media outlets that "Camelot has secured a line of credit through Chase Manhattan Bank and therefore will *guarantee* payment [to the media vendors]." *See id.* at 80:19–81:16; *see also* JE 48 (Emphasis added). Judy indicated that he intended to forward the Letter to media vendors. *See* Trans. at 82:20–24.

At all times relevant herein, Independence was a bank lender to MHW, with the bank loans secured by substantially all of MHW's assets, including accounts receivable. MHW closed its doors on October 22, 1996 and became the subject of a receivership action in the State of Ohio. *See* Mooney Dep. at 6:8–24. Initially, Camelot was advised by MHW employee Kim Colebrook ("Colebrook") that outstanding media invoices should be remitted directly to the appropriate media vendors by Camelot. *See* Trans. at 177:5–17. Subsequently, on October 24, 1996, Mooney advised Roberts that Colebrook had been mistaken and that all outstanding media invoices were to be paid to MHW according to the parties' agreement. *See id.* at 177:18–178:11.

Camelot remitted $203,294 to MHW in prepetition payments for MHW's media buying services. *See* JE 21 and JE 22. Subsequently, Camelot claims to have discovered that only $30,000 to $40,000 of that $203,294 had been paid to the various media vendors. *See* Trans. at 95:21–23.

MHW asserts that Camelot owes MHW $464,725.44 in postpetition obligations for media buying services provided by MHW. MHW owes Independence $598,999 plus interest, secured by a lien on MHW's accounts receivable, including accounts receivable resulting from MHW's postpetition services to Camelot. Independence's request for administrative expense payment arises out of its lien rights on those accounts receivable. *See* Albert Waino Deposition at 8:13–25; 11:10–15; 26:5–21; Mooney Dep. at 23:14–25:18; 58:18–23.

## DISCUSSION

*The § 363 Motion and Independence's Administrative Expense Claim*

█ Camelot seeks authority pursuant to § 363 to make payments outside the ordinary course of business to certain media vendors. By its motion, Camelot wishes to forgo making these payments to MHW for Camelot's postpetition media

buys and instead make payments directly to the appropriate media vendors thereby discharging its obligations to both MHW and the media vendors. Section 363 provides in relevant part:

> The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate.

11 U.S.C. § 363(b)(1). Camelot argues that it should be allowed to make payments outside the ordinary course of business because, based on standard industry practices and the nature of the parties' relationship as evidenced by their conduct and the surrounding circumstances, an agency relationship existed between itself and MHW such that Camelot is directly liable to the media vendors for its media buys and should be allowed to satisfy those obligations by direct payment.

█ Existence of an agency relationship is determined in light of the facts and circumstances of the parties relationship and the touchstone of an agency relationship is the extent to which the principal exercises control over the acts of the putative agent. *See, e.g., American Tel. and Telegraph Co. v. Winback and Conserve Program, Inc.*, 42 F.3d 1421, 1434–35 (3d Cir.1994); *Jack Eckerd Corp. v. Dart Group Corp.*, 621 F.Supp. 725, 732 (D.Del. 1985); *In re Dean L. Burdick Assoc., Inc.*, 19 B.R. 813, 814 (Bankr.S.D.N.Y.1982); *American Broad. Co., Inc. v. Climate Control Corp.*, 524 F.Supp. 1014, 1018 (N.D.Ill. 1981).

Camelot contends that, at all times during their relationship, Camelot acted as principal and MHW as agent in that Camelot instructed MHW to purchase ad space and MHW had no discretion in these buying decisions. Once media buys were approved by Camelot, MHW put the media vendors in contact with Camelot so that Camelot could provide the ad copy to the vendors. MHW made Camelot's role as advertiser known to all media vendors in the course of purchasing print space and air time for Camelot. Camelot also argues that, at the outset of their relationship, MHW requested Camelot's credit information so that that information could be provided to the media vendors. Camelot suggests that the contention that Camelot's prepetition credit worthiness was important to media vendors and thus further evidence of the agency relationship between Camelot and MHW is bolstered by the fact that, after Camelot filed for bankruptcy protection, MHW obtained the Letter from Camelot's Chief Financial Officer confirming Camelot's ability to pay it's postpetition obligations, written to allay the fears of Camelot's media vendors.

As further support of its position, Camelot argues that several order confirmations sent from media vendors to MHW indicate that the vendors believed that Camelot was financially liable for the media buys placed by MHW. *See* JE 47. A sampling of the order confirmations shows language such as: (i) "in the event of default on the part of the agency, advertiser shall have all obligations of a principal"; (ii) "notwithstanding to whom bills are rendered, advertiser, agency, and service, jointly and severally, shall remain obligated to pay the station the amount of any bills … until payment in full is received by station. Payment by advertiser to agency or to service … shall not constitute payment to station"; (iii) "If this agreement is entered into by an advertising agency on behalf of an advertiser, said agency jointly and severally undertakes the obligation of advertiser hereunder." *See id.* Camelot argues that the language found in these and other order confirmations is further proof of the agency relationship between itself and MHW and further supports Camelot's po-

sition that it is directly liable to the media vendors.

Additionally, Camelot argues that MHW's actions postpetition support the contention that MHW understood Camelot to be liable to the media vendors. When it was discovered that MHW had not billed Camelot for $140,000 worth of media buys, MHW expressed concern primarily for approximately $30,000 to $40,000 of $140,000 outstanding obligation to vendors because MHW had only separately contracted on that lesser amount and Camelot was understood to be directly obligated to the media vendors for the remainder. Moreover, some of MHW's key employees understood MHW to be employing a sequential liability scheme such that Camelot would be liable to media vendors on any unpaid invoices.

Camelot also introduced expert testimony suggesting that standard industry practice is such that the advertiser remained liable to the media vendors unless and until the vendors were paid in full. *See* Trans. at 19:17–24. Prior to 1972, the generally accepted practice in the industry was that the advertising agency was solely liable to the media vendors. *See id.* at 16:9–17:5. Media dissatisfaction with this arrangement saw the advent of joint and several liability for advertisers and agencies in all but the largest of the industry's agencies. *See id.* at 19:20–21:18; 25:15–26:6; 33:9–17. An agency the size of MHW is typically jointly and severally, or dually, liable with its advertiser-clients or at best sequentially liable in that, its advertiser-clients remain liable with MHW until the advertiser-client remits payment to the agency. *See id.* at 34:19–35:2. Camelot argues that this standard industry practice supports the contention that Camelot is directly liable to its media vendors unless and until those vendors are paid in full.

■ Finally, Camelot argues that MHW has not met its burden of demonstrating that MHW' actions provided a postpetition benefit to the estate such that the claim is entitled to administrative expense priority treatment pursuant to § 503(b)(1)(A).[4] *See Trustees of Amalgamated Ins. Fund v. McFarlins, Inc.*, 789 F.2d 98, 101 (2d. Cir.1986). Claims arising under § 503(b)(1)(A) are equitable in nature and thus are valued by the amount of postpetition benefit the claimant provides to the estate and not necessarily according to the contract terms underlying the claim. *See Matter of Continental Airlines, Inc.*, 146 B.R. 520, 528 (Bankr.D.Del.1992). Camelot contends that, at best, MHW is entitled to its 15% commission on any postpetition invoicing because the remaining 85% of its total billing was earmarked for payment in satisfaction of media vendor services by which the various vendors provided a benefit to the estate distinct and apart from any benefit conferred by MHW. According to Camelot, allowing MHW to receive any more than its 15% commission would constitute a windfall to MHW contrary to the intent of § 503 because it is only by the postpetition services provided to Camelot by MHW, to the extent it earned that 15% commission, that MHW provided any benefit to the estate. Moreover, Camelot maintains that the total amount in controversy is actually $139,428 and not $464,725.44 because approximately

---

4. Section 503 provides in relevant part:

 (b) After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including—

 (1)(A) the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case

 11 U.S.C. § 503.

$158,000 of the amount in dispute reflects advertisements run by MTV, Music Television, Inc. ("MTV") and an additional $127,885 reflects advertisements run by Black Entertainment Television, Inc. ("BET") pursuant to direct, contractual obligations between Camelot and those vendors that predated Camelot's relationship with MHW.[5] Camelot claims that it had direct obligations to MTV and BET and "Camelot was compelled to make payments to MTV and BET for postpetition services in order to avoid termination of those valuable contracts and the cancellation of scheduled advertising on the stations during the Christmas 1996 season." *See* Doc. # 1161, at 6.

Defendants counter that the critical question before the Court when considering Camelot's § 363 Motion is whether Camelot owed money to MHW for postpetition services, regardless of the nature of the relationship between and among Camelot, MHW, and the media vendors and irrespective of prevailing industry liability practices. Defendants argue that, if Camelot owed MHW money for services rendered between August 5, 1996 and October 22, 1996 when MHW closed its doors, Camelot should be required to make those payments directly to MHW pursuant to the parties' agreement and those payments are subject to Independence's security interest in MHW's accounts receivable.

Defendants point to the method of payment among the parties as evidence that Camelot owes postpetition payments to MHW. Prepetition, Camelot tendered payment directly to MHW for its media buying and creative services, with only two exceptions in which Camelot was mistakenly billed directly by vendors, mistakes, that were later corrected. Camelot paid

MHW on the invoices submitted, MHW retained its 10% commission on media buys and MHW was deemed entitled to 5% commission on gross sales for creative services provided to Camelot. The remaining 85% was earmarked for payment to the various media vendors. MHW and not Camelot dealt directly with the vendors and all of the media vendor invoices in question are in MHW's name and not Camelot's name. Camelot knew that MHW's payables included the cost of placing ads with vendors.

In support of their position, Defendants also point out that MHW was billed directly by media vendors. MHW verified the accuracy of these invoices, paid the vendors directly and then billed Camelot for those charges. Camelot remitted 100% of the payment for the media buys to MHW and all of these funds were deposited into MHW's only deposit account, commingled with funds received from other MHW clients. MHW treated monies owed by Camelot as accounts receivable and listed them as such in its books; Camelot apparently did not list the media vendors as accounts payable on its books.

Defendants further argue that Camelot had no control over MHW's payment of vendors. Camelot did not instruct MHW who to pay, when to pay, or how much to pay for the media buys. MHW dealt directly with the media vendors and did not refer vendors to Camelot for purposes of payment. Moreover, Defendants maintain that, despite Camelot's unsupported suppositions to the contrary, MHW did not seek Camelot's credit information for the benefit of media vendors but for its own review purposes. Defendants argue that, in every regard, MHW was not an agent of

---

**5.** Deducting the $158,000 and the $127,885 from $464,725.44 produces a figure of $178,840.44, not $139,428.00. I am unable to reconcile this difference on the record before me.

Camelot but rather an intermediary between Camelot and the media vendors, hired by Camelot to perform a business function that MHW fulfilled and for which it is entitled to payment.

Defendants argue that Camelot knew from the outset of their business relationship that MHW was to be directly billed by media vendors and Camelot would then be invoiced by MHW and the parties established their payment arrangements accordingly. Camelot willingly structured its relationship with MHW such that Camelot was, at all times, directly obligated to remit media buy payments to MHW.

Moreover, Defendants contend that Camelot's expert testimony does nothing to alter the nature of Camelot's obligation to MHW. According to the Defendants, no matter the type of industry standard for advertiser and agency liability to media vendors one might ascribe to the relationship between Camelot and MHW, Camelot remained liable to MHW under the terms of the parties' arrangement and prepetition practices. The media vendors' understanding of the parties' liability has no bearing on that relationship.

I find that Camelot, by its prepetition actions in satisfying the July 15 Invoice and August 2 Invoice, expressly acknowledged that the accepted method for paying its obligations for MHW's media buys on Camelot's behalf was to make direct payments to MHW. It would be inappropriate to allow Camelot to circumvent the prescribed method of payment as it pertains to Camelot's postpetition obligations to MHW. The parties agreed from the outset of their relationship that Camelot would pay MHW according to invoices received from MHW and that MHW would remit payment to the media vendors according to invoices it received from those vendors.

Moreover, regardless of the standard industry practice of dual liability for both advertisers and agencies when purchasing space and time from media vendors, Camelot remains primarily liable to MHW and must satisfy that liability. I do not believe that the Letter provided to MHW to allay the concerns of the media vendors postpetition alters the nature of the relationship between Camelot and MHW or makes it more likely than not that MHW understood itself to be an agent of Camelot. The question of agency has little impact on the fact that, according to the parties prior dealings and their understanding, Camelot was obligated to pay MHW for its media buying service and MHW was responsible to pay the invoices it received from the media vendors. A principal's actual or perceived obligation to a third party does not negate or neutralize its obligations to its agent pursuant to an undisputed agreement between the principal and agent. I believe this obligation to MHW includes payment for the media buys set up for Camelot with both MTV and BET despite Camelot's contention that these buys were made pursuant to contracts that pre-date its relationship with MHW. Camelot engaged MHW to make its media buys. MHW made those buys, including those at MTV and BET, according to the parties agreement. I see no reason to alter the parties' understanding during the postpetition period.

Additionally, I find that MHW provided postpetition services to Camelot to the benefit of the estate by procuring the required media vendor outlets for Camelot's advertising. It is not simply a matter of parsing out the "separate" benefits conferred on Camelot by MHW and the media vendor and paying each according to the 85%/15% split as Camelot urges; Camelot engaged MHW both to secure media vendors and assist in the creative process. MHW provided those services postpetition.

By providing those services postpetition, MHW conferred a benefit on the estate according to the parties' understanding of their business relationship and their prepetition conduct. Therefore, MHW has an administrative expense claim pursuant to § 503(b) against the estate in the full amount of its claim that must be satisfied by payment directly to MHW and not to Camelot's media vendors.

*The § 547 Action*

Camelot seeks recovery, pursuant to § 547, from either MHW or Independence of the prepetition payments made to MHW as avoidable preferential transfers. Section 547 provides in relevant part:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

\* \* \*

(f) For the purposes of this section, the debtor is presumed to have been insolvent on and during the 90 days immediately preceding the date of the filing of the petition.

(g) For the purposes of this section, the trustee has the burden of proving the avoidability of a transfer under subsection (b) of this section, and the creditor or party in interest against whom recovery or avoidance is sought has the burden of proving the nonavoidability of a transfer under subsection (c) of this section.

11 U.S.C. § 547.

█ It seems clear from the undisputed facts that the payments made by Camelot to MHW in satisfaction of the July 15 Invoice and the August 2 Invoice are preference payments as defined by § 547(b) and therefore subject to recovery by Camelot, absent a demonstration by MHW that the payments fit within one of the exceptions found in § 547(c). The payments were made to or for the benefit of a creditor as, relevant to the prepetition obligations at issue, MHW is certainly an "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor" as a creditor is defined by the Code. *See* 11 U.S.C. § 101(10). The record shows that the payments were made on account of antecedent debt owed by the debtor as these obligations arose beginning on June 6, 1996 when MHW placed the initial media buy for Camelot and the payments were made on account of services rendered by the creditor to the debtor before payment was made.[6] The payments were

---

**6.** Independence argues that, because payment was not yet due according to the terms of the invoices at issue, the requirement under § 547(b)(2) is not met because the debt,

made while the debtor was insolvent as Defendants do not contest that Camelot was insolvent at the time the payments were made and, therefore, § 547(f)'s presumption of insolvency has not been rebutted. The payments were clearly made within ninety days of the filing date as the payments were made on August 5, 1996 and Camelot filed for bankruptcy relief on August 9, 1996. Finally, the payments enabled the creditor to receive more than it would have in a Chapter 7 as Defendants to not dispute that MHW received more than it would have had Camelot initiated a Chapter 7 proceeding.

 Once a debtor has established that a payment constitutes an avoidable preference under § 547(b), the burden shifts to the transferee to demonstrate by a preponderance of the evidence that one of the exceptions to avoidance is applicable. *See* 11 U.S.C. § 547(g); *see, e.g., Trinkoff v. Porter's Supply Co. (In re Daedalean, Inc.)*, 193 B.R. 204, 211 (Bankr. D.Md.1996). Defendants raise the affirmative defense that Camelot's prepetition payments on these invoices are not avoidable preferences under § 547(b) because Camelot made the subject payments in the ordinary course of business and, therefore, they are excepted from recovery pursuant to § 547(c)(2). Section 547(c) provides in relevant part:

The trustee may not avoid under this section a transfer—

* * *

(2) to the extent that such transfer was—

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee; and

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms.

11 U.S.C. § 547. The three part ordinary course of business test is not disjunctive; a transferee must meet its burden on each of the elements of the test to defeat a debtor's avoidance power. *See, e.g., Logan v. Basic Distrib. Corp. (In re Fred Hawes Org., Inc.)*, 957 F.2d 239, 243 (6th Cir.1992). The debt underlying the payment must have arisen in normal business dealings between Camelot and MHW, the payments must be made according to the typical payment arrangements between Camelot and MHW, and those payment arrangements must be of a character typical of the industry in which Camelot and MHW are involved. *See id.*

Defendants do not dispute that the debt underlying the payments at issue arose in the ordinary course of business between Camelot and MHW. Camelot hired MHW to make its media buys for Camelot's advertising purposes, MHW fulfilled that

though admittedly antecedent, was not yet "owed by the debtor" before the transfer was made. *See In re Brennan*, 187 B.R. 135, 153 (Bankr.D.N.J.1995) (finding that an alleged preferential payment must be past due in order to avoid statutory redundancy in § 547(b)(2) and provide meaning to both "antecedent debt" and "owed by the debtor before [the] transfer was made"). However, Camelot correctly counters that this clause of § 547(b) is susceptible to alternative and more plausible interpretation in that the court

in *Brennan* emphasized "owed" when the clause is merely intended to require that the antecedent debt is owed "by the debtor" and not some other party. *See Berisford, Inc. v. Stroock & Stroock & Lavan (In re 1634 Assoc.)*, 157 B.R. 231, 233 (Bankr.S.D.N.Y.1993). I agree with Camelot's interpretation of § 547(b)(2) and therefore find that, in conjunction with satisfaction of the remaining requirements under § 547(b), all requirements for § 547 avoidable preference are met.

function, and Camelot was obligated to pay the invoices for MHW's services.

However, the parties dispute whether MHW is able to meet its burden under the second and third prongs of § 547(c)(2)'s ordinary course test. The second element of the test for ordinary course dealing is often referred to as the "subjective test," because it requires a showing that, as between the parties, the transfer was made in the normal course of their dealings. *See, e.g., R.M.L., Inc. v. Conceria Sabrina S.P.A.*, 195 B.R. 602, 613 (Bankr.M.D.Pa.1996). The third prong of the test is referred to as the "objective test" and requires a showing by the transferee that the transfer at issue somehow conforms to a broad range of practices within the parties' industry such that "only dealings so idiosyncratic as to fall outside that broad range should be deemed extraordinary and therefore outside the scope of [§ 547(c)(2)(C) ]." *See id.* at 615, *quoting In the Matter of Tolona Pizza Products, Corp.*, 3 F.3d 1029, 1033 (7th Cir.1993).

Camelot argues that its payment of the MHW invoices were not payments made in the ordinary course of business and therefore should not be excepted under § 547(c)(2). Although the payments were made within the "net 30" terms of the July 15 Invoice and August 2 Invoice, Camelot maintains that timeliness of payments is not alone dispositive in an ordinary course analysis. *See, e.g., In re Fred Hawes*, 957 F.2d at 244 (finding that even late payments made during the preference period, though presumptively "nonordinary," might be deemed in the ordinary course upon a showing that late payments were the norm in the parties' dealings); *In re Miniscribe Corp.*, 123 B.R. 86, 94 (Bankr. D.Colo.1991) (finding that timely and "more-timely" preference period payments were not made in the ordinary course

when prior payments were uniformly, and significantly late).

Additionally, Camelot argues that the payment method for the July 15 Invoice and August 2 Invoice varied from Camelot's ordinary course of business in that Camelot asked for invoices from MHW, rather that waiting for the invoices to be sent by MHW. Although MHW exerted no pressure on Camelot to make the payments due under the invoices, Camelot argues that the mere fact that Camelot initiated the payment sequence for these invoices suggests that the transfers were outside the ordinary course of business. *See, e.g., Sulmeyer v. Suzuki (In re Grand Chevrolet, Inc.)*, 25 F.3d 728, 732 (9th Cir.1994) (finding that any unusual collection or payment activity by either the debtor or creditor is a factor for consideration in making a § 547 ordinary course evaluation); *Grant v. SunTrust Bank, Central Florida (In re L. Bee Furniture Co.)*, 203 B.R. 778, 780 (Bankr. M.D.Fla.1996) (same). Congressional intent, as expounded in legislative history, suggests that § 547 looks to both debtor and creditor behavior during the preference period as it works to "discourage unusual action by either the debtor or his creditor during debtor's slide into bankruptcy." *See* H.R.Rep. No. 595, 95th Cong. 1st Sess. 373–74 (1977) reprinted in 1978 U.S.C.C.A.N. at 5787, 6329. Thus, it is not only undue pressure by creditors that might result in a finding that certain prepetition payments constitute impermissible preferential transfers but unacceptable debtor favoritism as well, as manifest in selective preference period payments to designated creditors by troubled debtors.

Camelot also asserts that the payments to MHW were not made in the ordinary course of Camelot's practices because Camelot neither sought nor was provided with any support documentation for the

invoices as was their customary practice. Moreover, the payments at issue were made within a week of receipt of invoices with minimal review of the invoices and their supporting documents. Generally, Camelot requires thirty days to complete the review and payment process.

Camelot further contends that MHW's delivery of the July 15 Invoice by hand and the August 2 Invoice by telecopy rather than the typical delivery by mail, shows that the transfers at issue occurred outside the ordinary course of business. Moreover, subsequent to Camelot's receipt of the invoices, the invoices were hand delivered directly to Camelot's Vice President of Finance for immediate payment. The internal processing of these invoices was not typical of Camelot's practices, which generally involved internal mail delivery to the accounting department, detailed review, followed by remittance by mail. For both the July 15 Invoice and the August 2 Invoice, payment was made to MHW in person at the August 5, 1996 business meeting, not by mail. Further, MHW was instructed by Camelot personnel to deposit the checks "quickly." This was not a typical instruction for recipients of Camelot's company checks.

Defendants argue that the payments fall within the ordinary course exception under § 547(c)(2) because the payments on the July 15 Invoice and the August 2 Invoice were timely made which raises a presumption of ordinariness of payment. *See, e.g., In re Daedalean,* 193 B.R. at 212; *In re Fred Hawes,* 957 F.2d at 244. Defendants further contend that there were no unusual factors and circumstances present that courts often look toward as indications that the payments at issue fall outside the ordinary course of business. Payment was made by Camelot company check, no cashiers check or other unusual payment method was employed. *See, e.g., Marathon Oil Co. v. Flatau (In re Craig Oil Co.),* 785 F.2d 1563, 1566–67 (11th Cir.1986). MHW did not threaten to institute an involuntary petition against Camelot. *See id.* at 1565. MHW did not request that Camelot make these payments and exerted no economic pressure on Camelot to compel payment. *See In re Miniscribe,* 123 B.R. at 88–89. Payments on both invoices were made in a customary manner, and were not in excess of the invoiced amounts. *See In re Vunovich,* 74 B.R. 629, 631 (Bankr.D.Kan.1987). Camelot was not in the midst of a well-publicized slide into bankruptcy; in fact, MHW was unaware that Camelot was about to file for Chapter 11 relief when Camelot made the transfers at issue. *See In re Miniscribe,* 123 B.R. at 89. Finally, payments were made while Camelot was still doing business. *See In re Craig Oil Co.,* 785 F.2d at 1568.

Defendants argue that only Camelot's internal handling of these payments was unusual. MHW had nothing to do with this internal procedure. Moreover, these payments were made within a reasonable time frame given Camelot's usual "quick payer" standards. Finally, Defendants argue that Camelot's hand delivery to MHW's financial officer was not so out of the ordinary as to raise questions as to the unusualness of the payments.

Section 547(c)(2)'s "subjective test" analysis is complicated under the present facts because the business relationship between Camelot and MHW was so short that they had not developed a pattern that one might reasonably label a course of dealing. Camelot hired MHW in May, 1996 and MHW did not submit any invoices to Camelot prior to the invoices in question that were submitted in early August, 1996.

In such instances where facts and circumstances make it all but impossible to find a course of dealing between the parties, courts have opted to make compari-

sons between the transfers at issue against an industry standard. *See, e.g., Sacred Heart Hospital of Norristown v. E.B. O'Reilly Serv. Corp. (In re Sacred Heart Hospital of Norristown)*, 200 B.R. 114, 117 (Bankr.E.D.Pa.1996) (holding that a "rigorous comparison to credit terms generally in a relevant industry" was required in a billing relationship that spanned only 16 months) quoting *Fiber Lite Corp. v. Molded Acoustical Prod., Inc.*, 18 F.3d 217, 226 (3d Cir.1994) (reasoning that, where a business relationship is of "recent origin, a significant departure from credit terms normal to the trade bears the earmarks of favoritism and/or exploitation . . ."). Because the business relationship between Camelot and MHW was so new at the time the transfers at issue were made, and that relationship commenced during a period in which Camelot was struggling to maintain its financial viability, MHW must provide sufficient information such that a comparison can be made between the transfers at issue and "ordinary terms . . . which prevail in healthy, not moribund, creditor-debtor relationships" in a similar industry. *See Molded Acoustical*, 18 F.3d at 227.

■ However, MHW provided no evidence of an industry standard for invoice payments between advertisers and agencies that I can use as basis for comparison. Defendants' arguments focus solely on the practices between the parties and comparison of that practice to evidence presented by Camelot as to its own prior practices. I am given no general industry standards and practices against which to compare the transfers at issue. Therefore, I can make no useful comparison and I must find that MHW has not met its burden pursuant to § 547(c)(2)(C).

■ Although a finding that a transferee has failed to meet its burden on any single element of its § 547 defense is fatal to that defense, I note that, even when examined subjectively, the transfers at issue bear too many indicia of being outside the ordinary course of dealings to find for Defendants. Camelot asked to be invoiced by MHW, a practice that can hardly be seen as within the ordinary course of business dealings by any reasonable measure and was doubtless neither Camelot's nor MHW's standard mode of invoicing. Camelot, contrary to its established practice, accepted the invoices in question by in-person and telecopy transmittal, without any supporting documentation. Additionally, contrary to traditional practices, Camelot paid these invoices without the benefit of reviewing supporting documentation. Moreover, Camelot paid the invoices in a matter of days by in-person delivery of company checks rather than in its usual 30 day turn around by mail delivery. Finally, Camelot instructed MHW to deposit the checks paying these invoices "quickly," an instruction that flies in the face of any reasonable understanding of the nature of such transfers in any business setting and a method that was, in all likelihood, not a common practice for either Camelot or MHW.

■ Section 547 strives to prevent the dual prepetition harms of creditors extracting payments from financially troubled debtors by exerting undue pressure on those debtors and debtors playing favorites among creditors by targeting those creditors to whom it wishes to make payments to the detriment of other creditors. Either practice is in direct contravention of the Code's policy of placing all similarly-situated creditors on equal footing. The facts and circumstances surrounding Camelot's prepetition transfers to MHW by which payments were hurriedly made to benefit creditors whose favor Camelot acknowledges it sought to retain postpetition, are precisely the kinds of transfers that § 547 allows to be avoided. There-

fore, I find that the payments made in satisfaction of the July 15 Invoice and the August 2 Invoice are recoverable by Camelot as avoidable preferences under § 547.

However, I find that Camelot can obtain recovery of the avoidable preference payments only from MHW and not from Independence because there is no evidence before me to suggest that Independence ever received the funds paid in satisfaction of the invoices at issue. The checks satisfying the July 15 Invoice and August 2 Invoice were issued to MHW and not Independence. *See* JE 21 and 22. Camelot has produced no evidence beyond unsupported assertions in its post-trial briefs that Independence was a subsequent transferee of these funds. Therefore, MHW alone is liable to Camelot for the recovery of the $203,294 determined to be a preferential transfer.

▉ Finally, Camelot suggests in a footnote that, should I deny the § 363 Motion and thereby find that MHW has a valid administrative expense claim pursuant to § 503 yet also find that MHW received an avoidable transfer under § 547, unless and until MHW restores the full amount of the preferential transfer, its administrative expense claim must be disallowed pursuant to § 502(d). Section 502(d) provides:

> Notwithstanding subsections (a) and (b) of this section, the court shall disallow any claim of any entity from which property is recoverable under section 542, 543, 550, or 553 of this title or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is

liable under section 522(i), 542, 543, 550, or 553 of this title.

11 U.S.C. § 502(d). Camelot argues that § 502(d) prohibits the allowance of any of MHW's claims, including its postpetition administrative expense request, until such time as MHW returns the payments made for the July 15 Invoice and August 2 Invoice to the extent those payments are deemed avoidable. Thus, Camelot argues that, because MHW has been judged to be the recipient of avoidable preference transfers, until MHW pays Camelot the $203,294 in preference payments, its $464,725.44 administrative expense claim should be disallowed.

However, I believe that § 502(d) is inapplicable in the present matter. Looking first to the language in § 502, I find several subsections that suggest that § 502(d) is not meant to affect administrative expense claims.[7] For example, in discussing treatment of claims objections, § 502(b) provides:

> Except as provided in subsections (e)(2), (f), (g), (h) and (i) of this section, if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States *as of the date of the filing of the petition,* and shall allow such claim in such amount
> . . .

> \* \* \*

11 U.S.C. § 502(b) (Emphasis added).

The exceptions identified in § 502(b) are as follows:

> § 502(e)(2), a claim for reimbursement or contribution . . . that becomes fixed after the commencement of the case;

---

**7.** *See,* 4 L. King, Collier on Bankruptcy, ¶ 502.05[2][b], p. 502–57, (rev. 15th ed.1998) (noting, without explanation, that administra-

tive expense claims allowed under § 503 are likely not subject to the reach of § 502(d)).

§ 502(f), (in an involuntary case, a claim arising in the ordinary course of the debtor's business or financial affairs after the commencement of the case but before the earlier of the appointment of a trustee and the order for relief);

§ 502(g), a claim arising from the rejection, under section 365 of this title or under a plan under chapter 9, 11, 12, or 13 of this title, of an executory contract or unexpired lease of the debtor that has not been assumed;

§ 502(h), a claim arising from the recovery of property under section 522, 550, or 553 of this title; and

§ 502(i), a claim that does not arise until after the commencement of the case for a tax entitled to priority under section 507(a)(8) of this title. *See* 11 U.S.C. § 502(e)(2)–(i).

Each of the express postpetition obligations found in § 502(e)(2) through § 502(i) further provides that such claims:

shall be allowed under subsection (a), (b), or (c) of this section, or disallowed under subsection (d) of this section, the same *as if such claim had become fixed before the date of filing of the petition.*

11 U.S.C. § 502(e)–(i) (Emphasis added). The express reference to, and treatment of, these other types of postpetition claims within the purview of § 502(d) suggests by negative implication that the drafters did not intend that administrative expense claims be subject to the set off provision of § 502(d).[8]

There is further statutory support for the proposition that administrative expense claims are to be excluded from the scope of § 502(d). For example, § 101(10) defines a "creditor" as:

(A) entity that has a claim against the debtor that arose *at the time of or before the order for relief* concerning the debtor; [or]

(B) *entity that has a claim against the estate of a kind specified in section 348(d), 502(f), 502(g), 502(h) or 502(i) of this title;*

11 U.S.C. § 101 (Emphasis added). Clearly, MHW's administrative expense claim did not arise prepetition pursuant to § 101(10)(A) and § 101(10)(B) sets forth, *inter alia,* the same postpetition exceptions that qualified for treatment under § 502(d) as addressed above in § 502(f)–(i). Thus, by definition, an administrative expense claimant is not considered a "creditor" pursuant to § 101(10).

Moreover, § 348(d), referenced in § 101(10)(B), addresses the effect of conversion, providing in relevant part:

a claim against the estate or the debtor that arises after the order for relief but before conversion in a case that is converted under section 1112, 1208, or 1307 of this title, *other than a claim specified in section 503(b)* of this title, shall be treated for all purposes as if such claim had arisen immediately before the date of the filing of the petition.

11 U.S.C. § 348 (Emphasis added). Here, the language expressly exempts administrative expense claims from the section's scope, lending further support to the view that administrative expense claims are entitled to distinct treatment separate and apart from pre-petition, or deemed pre-petition, creditor claims.

One final example helps underscore the point that administrative expense claims are unique creatures in the bankruptcy landscape, particularly as they pertain to § 502(d). Section 501, which deals with

---

8. According to traditional precepts of statutory interpretation, *affirmatio unius exclusio est* *alterius;* the affirmance of one thing is the exclusion of the other.

filing proofs of claim, provides in relevant part:

(d) *A claim of a kind specified in section 502(e)(2), 502(f), 502(g), 502(h), or 502(i) of this title may be filed under* subsection (a), (b), or (c) of this section the same as if such claim were a claim against the debtor and had arisen before the date of the filing of the petition.

11 U.S.C. § 501(d) (Emphasis added). The explicit references to postpetition claims other than administrative expense claims, including those found among the exceptions in § 502(d), again demonstrate that administrative expense claims are accorded special and distinct treatment and are not within the purview of § 502(d).

Moreover, I find that applying § 502(d) to administrative expense claims does nothing to advance § 547's goal of equitable distribution to similarly-situated creditors by preventing any one creditor from receiving preferential treatment from a troubled debtor on its way to the bankruptcy court. Administrative expense claims, by definition, arise during the post-petition period. They are given priority status in recognition of the fact that the services provided by administrative expense claimants are designed to facilitate a debtor's survival during, and emergence from, bankruptcy to the benefit of all creditors. Thus, I find that attempts to apply the coercive effect of § 502(d) in an effort to dislodge preference payments by disallowing otherwise legitimate administrative expense payments under § 503 subverts the priority scheme in bankruptcy to no practical effect.

## CONCLUSION

For the reasons set forth above, Camelot's § 363 Motion is denied, Camelot is entitled to judgment against MHW on its § 547 action and Independence is entitled to an administrative expense claim on MHW's post-petition invoices to Camelot.